672 F.2d 1159
 109 L.R.R.M. (BNA) 2889, 93 Lab.Cas. P 13,272
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL 483 AND LOCAL 11, INTERNATIONAL ASSOCIATION of BRIDGE,
STRUCTURAL AND ORNAMENTAL IRONWORKERS, AFL-CIO, Respondents.
 No. 81-1353.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 27, 1981.
Decided Feb. 9, 1982.
 
 Elliott Moore, Deputy Associate Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, William A. Lubbers, Gen. Counsel, Sandra Shands Elligers, Eric Moskowitz (argued), N.L.R.B., Washington, D. C., for petitioner.
 John J. Mulvihill (argued), Nolan, Bell & Moore, Mantoloking, N. J., for respondents.
 Before ADAMS, VAN DUSEN and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 VAN DUSEN, Senior Circuit Judge.
 
 
 1
 In this case, the National Labor Relations Board (Board) makes application for enforcement of its March 3, 1980, order[1] directing the respondent local unions to cease discriminating against non-members, in violation of sections 8(b)(1)(A) and 8(b)(2) of the National Labor Relations Act (Act), 29 U.S.C. §§ 158(b)(1)(A) & 158(b)(2) (1976),[2] in the operation of their exclusive hiring halls and to make the named discriminatees whole for their lost earnings. In addition, the order extends the same remedies to "all others similarly situated." The respondents maintain that the Board's findings of discrimination are not supported by substantial evidence and that their extension of the remedies to unnamed, "similarly situated" discriminatees is improper. This court has jurisdiction under 29 U.S.C. § 160(e) (1976).
 
 
 2
 Because we believe that the Board's opinion does not provide an adequate basis upon which to review its decision and order, we will deny the petition for enforcement and refer the case to the Board for such further proceedings and more particularized findings of fact as it deems appropriate.
 
 I.
 
 3
 This is the latest in a series of cases involving member locals of the District Council of Northern New Jersey, International Association of Bridge, Structural and Ornamental Ironworkers, AFL-CIO (the District Council). At all relevant times, the District Council had a collective bargaining agreement (the contract) with the Building Contractors Association of New Jersey which provided in pertinent part:
 
 
 4
 "15.1 Every Employer bound hereby agrees that he will recruit all employees covered hereby exclusively through the several hiring halls operated by the Union and/or its Locals. The said hiring halls shall be operated by the Union and its Locals in a non-discriminatory manner and on a non-discriminatory basis in accordance with the said Decree in U.S. v. Plumbers Local 24 et al Civil Action No. 444-71 etc ...""15.2 The said hiring halls shall be operated in accordance with the provisions of said decree mentioned in the preceding Article."
 
 
 5
 The consent decree referred to was entered in 1972 as part of the settlement of an employment discrimination suit brought by the United States against the District Council and others under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1976) (Title VII). The provisions of the consent decree set forth in detail how the mechanics of the hiring hall system were to operate in order to prevent future discrimination.
 
 
 6
 The gist of the system is that any ironworker, whether a member of the local or not, may request referral at the hiring hall and must be referred to a job in the chronological order of his request. In order to ensure fairness, the consent decree requires that each local maintain two bound registers: a "Referral Register" and a "Contractor's Requisition Register." An ironworker seeking referral comes to the hiring hall and signs the referral register with his name, the date, his union affiliation, and the ironworker skills (there are about 12) in which he is qualified. When a contractor calls to request workers, the requisite number of those available who have the needed skills are called in the order in which they signed the register. If present in the hall, they are referred to the job; if not, their names are removed from the list and they must re-sign the register and begin working their way back to the top of the list.[3] At the same time, the contractor, the contractor's representative making the request, and the names of those workers referred are entered in the contractor's requisition register. When the job is completed, the workers must return to the hall, re-sign the register, and await another referral.[4]
 
 
 7
 Under the terms of the decree, there are several instances in which it is proper to refer workers out of chronological order. The first two of these exceptions do not play a major role in this case. First, the union may refer a senior, experienced local member to act as steward on the job. Second, contractors who are required to meet affirmative action criteria may request workers of a given race and such workers may then be referred out of order. The third principal exception is the primary one at issue here. Under this provision, if a contractor requests a certain worker or workers by name, they may be referred out of order. In such a case, the reason for the out-of-order referral must be noted in the "remarks" column of the referral register and the "union shall request written confirmation from the contractors of each request or referral of applicants by name." Consent Decree P 27(c), reprinted in Brief for Respondent at 6 (emphasis added). There is no provision in the decree or the contract requiring the contractor to send the letter upon request or forbidding the union from referring the worker unless a letter is received.[5]
 
 
 8
 In addition, the unions here evolved another informal exception which they designate variously as "recalled" or "returned to work." Under this exception, a worker who is referred to a job which is suspended before completion-due, for instance, to weather, strikes, or the scheduling of the work of other trades-and who re-signs the register in the meantime may be referred back to the original job out of order if it resumes. The Board does not recognize this as a distinct exception but treats it as a "requested" referral.
 
 
 9
 In several earlier cases[6] involving other northern New Jersey ironworker locals, all of which are parties to the same contract and consent decree and operate hiring halls identical to those at issue here, the Board found widespread discrimination by the locals in favor of their own members, highlighted by grossly disproportionate referral statistics and what the Board found to be an "inescapable inference of deceit" in maintaining the referral register. This inference was raised by findings such as the out-of-order referral of member-apprentices as stewards ahead of experienced non-members;[7] that one local referred its own members out of order fully 75% of the time during one 11-month period[8] and 82% of the time during one five-month period;[9] and the locals' failure to substantiate these large numbers of out-of-order referrals with any documentary evidence-including, in one case, the failure even to produce the contractor's requisition register.[10] Thus concluding that the referral registers had been kept as a sham or pretext to hide discrimination, the Board decided that, with limited exceptions, each unexplained or "requested" designated out-of-order referral of a local member appearing on the face of the referral register would constitute a prima facie violation of the Act and that the burden would be upon the local to prove the validity of each referral by producing the requisition register, the confirming request letter from the contractor, or "other evidence of sufficient probity." Ironworkers, Local 373, 235 N.L.R.B. at 233 n.7.[11] The Board then concluded that this burden had not been met as to nearly all the charging parties and ordered backpay and prospective relief. The Board also extended its holding to "all others similarly situated," requiring the local to rebut, in subsequent "compliance proceedings," similar prima facie showings of the General Counsel. This court enforced without opinion all of the Board orders.[12]
 
 
 10
 In this case, the General Counsel, the administrative law judge (ALJ), and the Board treated the situation as virtually identical to the earlier cases. With few exceptions, the General Counsel alleged, and the ALJ found, a violation of the Act on each occasion where a local member was referred out ahead of a non-member with either no explanation or with a "requested" or "returned to job" notation unsupported by a contractor's request letter. Unlike the earlier cases, however, the locals did enter their contractor's requisition register into evidence. Further, officials of both Local 483 and Local 11 testified as to the mechanics of the hiring hall operation and in rebuttal to the evidence brought out in the General Counsel's case. In many instances, contractor request letters were produced for out-of-order "request" referrals and, in others, the officials testified to their recollection of specific referrals. In his opinion, the ALJ, after reciting the largely undisputed backgrounds facts concerning the earlier cases and the mechanics of the hiring hall operation, went through the referral register in summary fashion listing the total number of times that each named charging party was bypassed, without reference to, or discussion of, each specific instance. Further, any purported explanation or justification of a bypassing, other than an actual request letter, was either rejected outright by the ALJ or held to be relevant only to the issue of damages in the subsequent compliance proceeding. Nowhere in the ALJ's opinion is there any discussion of the contractor's requisition registers. In addition, there was no finding by the ALJ of an "inescapable inference of deceit" in the keeping of the referral register or any determination that the records were a sham or pretext to conceal discrimination. When faced with the locals' arguments that the consent decree did not require that there be a letter in the file for each "request" referral, the ALJ concluded that such a defense had been foreclosed by the earlier cases. The ALJ took a similar position with respect to the locals' argument that the "similarly situated" remedy was inappropriate. In short, the ALJ concluded that this case was essentially the same as, and controlled by, the earlier Ironworkers cases and recommended a similar order.
 
 
 11
 Following the issuance of the ALJ's opinion, all of the parties, including the General Counsel, joined in a motion requesting that the Board remand the case to the ALJ for more specific findings of fact and an enumeration of the specific instances of unlawful bypassing he found. The Board denied the motion. The locals then filed their exceptions to the ALJ's proposed order and another motion for remand, challenging both the lack of specificity of the ALJ's findings and the appropriateness of the "similarly situated" remedy. In a brief opinion and order, the Board denied the motion to remand "as lacking in merit" and affirmed and adopted without further comment the "rulings, findings, ... conclusions, ... and recommended Order" of the ALJ.
 
 
 12
 The Board now makes application to this court for enforcement of its order.
 
 II.
 
 13
 At the outset, it must be kept in mind that this is a case involving alleged unfair labor practices; that is, violations of the National Labor Relations Act. The question presented by the application of sections 8(b)(1)(A) and 8(b) (2) to these facts is whether, in the operation of their exclusive hiring halls, the respondent locals in fact discriminated against non-members in violation of their rights under section 7 of the Act or against those to whom membership in the local was denied, in violation of section 8(b)(2). The issue is not whether the locals are in contempt of court or breach of contract for having failed to comply with one or more provisions of the consent decree. A failure to comply with the consent decree does not necessarily constitute a violation of the Act. As the Supreme Court observed in applying section 8(a)(3), the Act does not establish per se rules but rather focuses on why some action is taken or what effect it has on the exercise of an employee's section 7 rights:
 
 
 14
 "Thus this section does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished by discrimination is prohibited. Nor does this section outlaw discrimination in employment as such; only such discrimination as encourages or discourages membership in a labor organization is proscribed."
 
 
 15
 Radio Officers v. Labor Board, 347 U.S. 17, 42-43, 74 S.Ct. 323, 336-37, 98 L.Ed. 455 (1954). As a result, "(i)t is the 'true purpose' or 'real motive' in hiring or firing (or, in this case, referral) that constitutes the test." Teamsters Local 357 v. Labor Board, 365 U.S. 667, 675, 81 S.Ct. 835, 839, 98 L.Ed. 455 (1961). It is this intentional discrimination which the Board must find has been established by substantial evidence. See Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); Metropolitan Edison Co. v. N.L.R.B., 663 F.2d 478, 484 (3d Cir. 1981). As a result, and notwithstanding any implications to the contrary in the Board's arguments here, a union may lawfully refer one worker ahead of another for any good faith reason which is neither arbitrary[13] nor based on union membership or activity. See, e.g., Teamsters Local 20, Etc. v. N.L.R.B., 610 F.2d 991, 993-94 (D.C.Cir. 1979); N.L.R.B. v. Local 294, International Bro. of Teamsters, Etc., 317 F.2d 746 (2d Cir. 1963). The fact that that reason is not embraced by the Title VII consent decree does not change this. Thus, "requested" referrals without a supporting letter, "recalled" or "returned to work" referrals, or even unexplained out-of-order referrals, all of which might in some circumstances constitute persuasive evidence of discriminatory intent, do not in themselves constitute violations of the Act unless and until the Board finds by substantial evidence that the referral was in fact based upon union membership or activity and that the purported justification, if any, is mere pretext.[14]
 
 
 16
 It is also true, however, that "(s)ome conduct may by its very nature contain the implications of the required intent; the natural foreseeable consequences of certain action may warrant the inference." Teamsters Local 357 v. Labor Board, supra, 365 U.S. at 675, 81 S.Ct. at 839. In the context of a section 8(a)(3) violation by an employer, the Court has found that where the challenged action "inherently encourages or discourages union membership, ... specific evidence of intent is not an indispensable element of proof." Radio Officers v. Labor Board, supra, 347 U.S. at 44-45, 74 S.Ct. at 337-38. See also Labor Board v. Erie Resistor Corp., 373 U.S. 221, 227, 83 S.Ct. 1139, 1144, 10 L.Ed.2d 308 (1963); N.L.R.B. v. Moore Business Forms, Inc., 574 F.2d 835, 841 (D.C.Cir.1978). Thus, the Board could find that on a given day local member A was referred ahead of non-member B; that, for articulated reasons, the facts compel the conclusion that the reason was union membership; and, explaining the basis for its conclusion, that the union's explanation, if any, is not credible. If such findings are supported by substantial evidence on the record as a whole, the Board's remedial order would be enforceable by this court. Such findings have not been made by the Board here.
 
 
 17
 The only findings we have before us in this case, in light of the summary action by the Board, are those in the opinion of the ALJ. The only information that the ALJ, in turn, has given us is a summary of the total number of instances in which his reading of the referral register indicates that a given charging party was bypassed, his conclusion that all of the disputed legal issues in the case are controlled by the previous Ironworkers cases, and his assurances to the respondent locals that their factual defenses to specific instances of discrimination may be raised in the subsequent "enforcement proceedings." It is the second of these conclusions which we believe to be the root of the problem here. We do not interpret our previous summary enforcement orders as establishing legal principles of broad application which relieve the General Counsel of proving his case and the Board of articulating its findings with sufficient specificity to permit the respondents to mount a meaningful defense and this court to perform a meaningful review. As we will discuss, those cases involved findings of unique and overwhelming factual situations which the Board may have believed to be present here but which the Board did not explicitly or even implicitly find to be present. In the absence of such findings, the Board was not justified in treating this as "just another Ironworkers case."
 
 
 18
 Specifically, a reading of the Board and ALJ opinions in the earlier cases discloses specific findings of "widespread and pervasive" discrimination. See Ironworkers, Local 45, 232 N.L.R.B. at 520; Ironworkers, Local 373, 232 N.L.R.B. at 504. The numerical and statistical evidence was overwhelming and supported a finding that the discrimination was so widespread and systematic as to make particularized proof of each instance of discriminatory referral impractical and unnecessary. The facts approached those of the industry-wide "pattern and practice" racial discrimination cases which have arisen under Title VII and which have permitted this sort of generalized "prima facie case shifting the burden of individual rebuttal" mode of proof. See generally Teamsters v. United States, 431 U.S. 324, 334-43, 97 S.Ct. 1843, 1854-58, 52 L.Ed.2d 396 (1977). In short, they were exceptional cases. The Board has made no finding, and it is not manifest from the record, that the same is true here.
 
 
 19
 Similarly, this case presents substantial factual differences in terms of the evidence offered by the respondent locals. First and foremost, in the earlier cases, the ALJ found that the enormous disparity between member and non-member referrals, coupled with the complete absence or implausibility of the recorded explanation, gave rise to an "inescapable inference of deceit" in the maintenance of the referral registers. See, e.g., Ironworkers, Local 373, 232 N.L.R.B. at 505. Thus, the ALJ found as a fact, which the Board adopted, that unsupported "requested" or "recalled" entries in the referral register were unreliable and thus required supporting evidence. In those cases, that finding, on a factual question of proof, was supported by substantial evidence and was accepted by this court. Here, there was no such finding of deceit and unreliability, but rather a conclusion that the absence of a request letter made out a violation as a matter of law citing as authority only the earlier cases. This we hold to be insufficient for, as we noted above, while the records mandated by the consent decree are a prime source of evidence in these cases, a referral in violation of the consent decree is not, ipso facto, a violation of sections 8(b)(1)(A) and 8(b)(2). Further, the earlier cases generally involved the failure of the respondent locals to produce any evidence corroborating the referral register entries. In Local 373, for example, the ALJ focused on the union's failure to introduce the request letters, the contractor's requisition register, "or other evidence of sufficient probity." See 232 N.L.R.B. at 506 n.8 (ALJ opinion). In this case, the locals did supply the requisition register and continue to assert that it contains much of the information at issue. Nonetheless, neither the ALJ nor the Board even mentions its existence, much less discusses its contents or explains the reasons for discrediting it.[15] Similarly, there was substantial live testimony from officials of the respondents concerning local practice, record keeping, and their knowledge of individual instances of alleged discrimination. Much of this testimony tends to support the respondents' contention that their procedures were fair, non-discriminatory, and quite unlike the systematic discrimination practiced by the other locals. Again, however, there is no discussion at all of this testimony by the Board or the ALJ. While the decision of the ALJ on a question of witness credibility is normally entitled to deference, there is no such credibility judgment apparent on this record.[16] Finally, the summary nature of the ALJ's opinion places both the respondents and this court in the untenable position of attempting to guess which of the literally hundreds of referrals contained in the register were found to have been discriminatory. The very fact that all of the parties joined in the motion for remand to the ALJ reinforces this fact, and the Board's position here that the locals "know the contents of their own records" is a less than compelling argument.
 
 
 20
 In sum, if the Board wishes to treat this case as identical to the previous Ironworkers cases, then it must find, and support by substantial evidence, a proper factual basis for doing so. In any case, the respondent locals are entitled to, and enforcement of the Board's order depends upon, findings of sufficient specificity so that it is clear when a violation occurred and, as to that violation, which evidence was credited and which discredited. We conclude that the Board's opinion in this case is not sufficient to permit enforcement of the Board's order. We will, therefore, deny the application and refer the case to the Board for such further proceedings as it may deem appropriate in light of this opinion. Cf. NLRB v. Armcor Industries, Inc., 535 F.2d 239, 246 (3d Cir. 1976).
 
 III.
 
 21
 Just as our enforcement orders in the earlier Ironworkers cases are not necessarily dispositive of the issues of proof as to the named charging parties, neither do they exclusively "constitute 'the law' with respect to the issues in this case" concerning the propriety of extending the remedy to "all others similarly situated." See ALJ opinion at 20-21, reprinted at 20a-21a; Brief for Petitioner at 28. As we noted, the lack of specificity in the opinions of the ALJ and Board and the record before us precludes us from finding that the ALJ's conclusion that "the five (Ironworkers) cases previously cited ... are in all respects virtually identical to the instant case" (21a) is correct. Further, the cases cited by the Board (Br. at 28 n.27) in support of its argument that "identification of the particular individuals who were victimized by the Locals' discriminatory practices ... are matters which affect the scope of the remedy rather than the nature of the violations, and are therefore properly reserved for the compliance stage of these proceedings" are inapposite. See N.L.R.B. v. Teamsters & Allied Workers, Hawaii Local 996, 313 F.2d 655, 659 (9th Cir. 1963); N.L.R.B. v. Local 803, Int'l Broth. of Boilermakers, Etc., 218 F.2d 299, 303 (3d Cir. 1955). While those cases do say, although in an offhand way, that the specific amount of backpay to which an individual named charging party is entitled need not be determined until the "compliance stage" of the proceeding, neither case even vaguely concerns itself with postponing the identification of the victims of the alleged discrimination.
 
 
 22
 As the ALJ correctly observed in Local 373, the Board is not limited to its traditional, individualized remedies in cases
 
 
 23
 "of such widespread flouting of the law, such longstanding, repetitious, and pervasive violations of the statute, that the normal or usual remedial Board techniques are useless."
 
 
 24
 232 N.L.R.B. at 518 (opinion of ALJ). Where reliance on traditional remedies would render the protections of the Act meaningless, the Board may fashion remedies "of a force and character to meet the offenses." Id. at 517. See, e.g., N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); Franks Bros. Co. v. N.L.R.B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 435 (1944). In the earlier cases, the ALJ found, and the Board adopted, specific findings of "widespread and pervasive" violations and clearly articulated the need for the remedy. The correct reading of our enforcement orders is that these findings were supported by substantial evidence and the remedies were appropriate given the findings. Given the complete lack of such findings or any similar justification for extending backpay beyond the named charging parties, our earlier decisions do not provide blanket authority for the application of the "similarly situated" remedy on the record before the Board in this case.
 
 IV.
 
 25
 For the foregoing reasons, the application for enforcement will be denied and the case referred to the Board for such further proceedings as it deems appropriate in accordance with this opinion.
 
 
 
 [1]
 As noted at the end of part I of this opinion, this order of the Board adopted the recommended order of the administrative law judge without change in a two-page decision of the Board
 
 
 [2]
 These sections provide in pertinent part:
 "(b) It shall be an unfair labor practice for a labor organization or its agents-
 "(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title:
 "(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; ..."
 29 U.S.C. § 158(b)(1)(A), (b)(2) (1976).
 
 
 [3]
 One of the locals involved here informally adopted a "three strikes" policy whereby a worker's name was not removed from the list unless he was absent three times in succession. Although not provided for in the consent decree, this practice is not challenged here
 
 
 [4]
 Here again, the locals adopted a policy whereby a worker whose referral turned out to be only a one or two-day job was not dropped to the bottom of the list. The testimony disclosed that this was a concession to the state of the economy and its effects on the building trades, and it too is not an issue here
 
 
 [5]
 Other exceptions exist covering the referral of experienced foremen, apprentice trainees, and for requests made after normal referral hours or on weekends and holidays
 
 
 [6]
 Ironworkers, Local 480, 235 N.L.R.B. 1511 (1978), enforced sub nom. N.L.R.B. v. International Association of Bridge, Structural & Ornamental Ironworkers, Local 480, AFL-CIO, 598 F.2d 611 (3d Cir. 1979) (unpublished order); Ironworkers, Local 373, 235 N.L.R.B. 232 (1978) & 232 N.L.R.B. 504 (1977), enforced sub nom. N.L.R.B. v. International Association of Bridge, Structural & Ornamental Ironworkers, Local 373, 586 F.2d 835 (3d Cir. 1978) (unpublished order); Ironworkers, Local 45, 232 N.L.R.B. 520 (1977), enforced sub nom. N.L.R.B. v. Bridge, Structural & Ornamental Ironworkers, Local 45, 586 F.2d 835 (3d Cir. 1978) (unpublished order); Ironworkers, Local 45, 232 N.L.R.B. 504 (1977), enforced sub nom. International Association of Bridge, Structural & Ornamental Ironworkers, Local 45 v. N.L.R.B., 586 F.2d 834 (3d Cir. 1978) (unpublished order)
 
 
 [7]
 Ironworkers, Local 480, 235 N.L.R.B. at 1513
 
 
 [8]
 Ironworkers, Local 45, 235 N.L.R.B. at 212
 
 
 [9]
 Ironworkers, Local 373, 235 N.L.R.B. at 232-33
 
 
 [10]
 Id. at 233 n.7
 
 
 [11]
 It should be noted that the Board mentions the requisition register as being evidence "of sufficient probity" in its Local 373 opinion, but demands actual request letters or their equivalents in the other cases
 
 
 [12]
 See note 6 supra
 
 
 [13]
 In addition to its obligations under section 8(b) of the Act, but not at issue here, is the union's duty of fair representation to its members and, due to the exclusivity of the hiring hall, to non-members who are forced to depend upon it for job referrals. In addition to overt discrimination, the duty of fair representation precludes any arbitrary or bad faith conduct on the part of the union. See Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967); Findley v. Jones Motor Freight, Etc., 639 F.2d 953 (3d Cir. 1981)
 
 
 [14]
 However, a union's disregard of the contractual rules for operation of a hiring hall has been considered to be strong evidence of unlawful discrimination. Local No. 725, etc., 225 NLRB 138, 143 (1976), enforced, 572 F.2d 550 (5th Cir. 1978); Iron Workers Local No. 290, etc., 184 NLRB 177, 187 (1970), enforced, 443 F.2d 383 (6th Cir. 1971)
 
 
 [15]
 In its brief, the Board argues that such explanation is unnecessary because, while the locals introduced the requisition registers into evidence, they did not "rely" on them. See Br. at 23 n.20. We fail to see why this is so. The locals were faced with a generalized allegation that there were unexplained or insufficiently substantiated referrals in the referral register. They replied that some, if not all, such referrals could be explained by information in the requisition register and entered it into evidence. This would appear to us to constitute "reliance" within the plain meaning of the word. Further, if the ALJ is capable of going through the referral register and compiling a summary of deficient entries, as he did here, it seems reasonable that he would then compare his results with the relevant entries in the requisition register
 
 
 [16]
 For example, chief among the Board's contentions in the earlier cases-and presumably here as well-is that the fact that local members are marked "requested" and referred out of order far more often than are non-members supports the inference that the "requested" designation is being used as a pretext. Before the ALJ, Jack Templeton, Business Agent of Local 483, testified that, generally, the non-local members received their Ironworker "books," or memberships, from distant locals which did not operate apprentice programs or conduct examinations before admitting an applicant to journeyman status. Thus, he explained, many non-local members lacked the skills possessed by local members who had completed the local's three-year apprenticeship program and whose skills were known to local contractors. When business was good, these non-members were "kept busy" at local jobs in what were essentially unskilled "gopher" jobs. As the economy declined and jobs became tighter, these positions were the first to go and contractors were careful to request those whom they knew to be skilled to fill the limited number of jobs they had available. See 206a-225a
 Of course, the ALJ could have found this testimony to be self-serving and not worthy of belief in light of all the evidence. On the other hand, if believed, it provides a valid, non-discriminatory explanation for some of the statistical evidence. Just as with the contractor's requisition register, however, we have no indication of whether this testimony was accepted, rejected, overlooked, or ignored.