INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 211, Petitioner in No. 86–3448,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 211, Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Petitioner in No. 86–3511.

Nos. 86–3448, 86–3511.

United States Court of Appeals, Third Circuit.

Argued March 19, 1987.

Decided June 19, 1987.

James Katz (argued), Robert F. O'Brien, Tomar, Seliger, Simonoff, Adourian and O'Brien, Haddonfield, N.J., for petitioner.

Rosemary M. Collyer, General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Associate General Counsel, Elliott Moore, Deputy Associate General Counsel, Paul J. Spielberg, Deputy Asst. General Counsel, Michael D. Fox (argued), Atty., N.L.R.B., Washington, D.C., for respondent.

Before HIGGINBOTHAM, MANSMANN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

These consolidated matters come before us following a decision and order by the National Labor Relations Board ("NLRB"

or "the Board"). The petitioner—Local 211, International Brotherhood of Electrical Workers ("the Union")—appeals pursuant to 29 U.S.C. § 160(f) (1982) from the Board's order and the Board, as cross-petitioner, applies for enforcement of its order as provided in 29 U.S.C. § 160(e) (1982). We find that the NLRB properly concluded that the Union's repeated failure to refer jobs to the complainants, Robert Campbell and James Walker, according to established hiring hall procedure violated § 8(b)(1)(A) and 8(b)(2) of the National Labor Relations Act ("the Act").[1] We, therefore, will enforce the NLRB's order in full.

## I.

The Union is an inside wiremen's local of the International Brotherhood of Electrical Workers ("IBEW"), which represents electricians employed by companies in the Atlantic Division of the Southern New Jersey Chapter, Inc., National Electrical Contractors Association ("the Association"). The Union and the Association were parties to numerous collective bargaining agreements over several years. The pertinent contract covering commercial construction ("the Commercial Agreement") permits the Union to run an exclusive hiring hall for the Association's employer-members.

The Commercial Agreement provides in relevant part:

5.4 The Union shall maintain a register of applicants for employment established on the basis of the groups listed below. Each applicant for employment shall be registered in the highest priority group for which he qualifies.

GROUP I—All applicants for employment who have four or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a journeyman's examination given by a duly constituted Local Union of the IBEW and who have been employed for a period of at least one year in the last four years under a collective bargaining Agreement between the parties to this Agreement.

GROUP II—All applicants for employment who have four or more years' experience in the trade and who have passed [a] journeyman's examination given by a duly constituted Local Union of the IBEW.

GROUP III—All applicants for employment who have two or more years experience in the trade, are residents of the geographical area constituting the normal construction labor market and who have been employed for at least six months in the last three years in the trade under a collective bargaining Agreement between the parties to this Agreement.

GROUP IV—All applicants for employment who have worked at the trade for more than one year.

The Commercial Agreement directs the Union to keep an "Out of Work List" of "the applicants within each group in chronological order of the dates they register their availability for employment." The Agreement also obligates the Union to "refer applicants ... by first referring applicants in Group I in the order of their places on the Out of Work List and then referring applicants in the same manner successively

1. 29 U.S.C. § 158(b)(1)(A) (1982) states:
    It shall be an unfair labor practice for a labor organization or its agents—(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title [relating to the right of employees as to organization, collective bargaining, and so forth]: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein[.]
    29 U.S.C. § 158(b)(2) (1982) provides:
    It shall be an unfair labor practice for a labor organization or its agents—(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section [generally proscribing discrimination in regard to hire or tenure of employment or any term or condition of employment, to encourage or discourage union membership] or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership[.]

from the Out of Work List in Group II, then Group III, and then Group IV."

The Union required that first-time applicants complete a personal registration card. This "Registration for Referral Group" asked registrants to identify themselves as "journeyman wireman," "journeyman lineman," "residential wireman," "welder," or "other." The card also inquired whether the applicant had passed a journeyman examination or had completed an IBEW-certified apprenticeship program, and how long he had labored under a Union/Association collective bargaining agreement in the preceding four years. Beyond the collective bargaining agreement, the Union further required each applicant to sign a daily ledger at least once a week in order to maintain his place on the Union referral list. Only electricians actually present in the hiring hall, however, could receive referrals. The name of an applicant who declined a job was transferred to the bottom of the referral list for his group.

The charging parties, Campbell and Walker, are non-Union electricians. On May 1, 1980, they complained to the Union business manager, George Stockinger, about a present lack of work. When Stockinger failed to explain the absence of referrals, Campbell asked how to become a Union member. Stockinger responded that the Union had an apprenticeship program and that Campbell and Walker could apply for membership the following week. During this conversation, Stockinger also threw a copy of the IBEW's by-laws on his desk and said "show me in here where I've got to send you to work." On May 6, 1980, Campbell and Walker applied for Union membership. They reapplied on October 10, 1980 and submitted resumes of their experience.

Under the Commercial Agreement, electricians with four years "experience in the trade" may take the journeyman examination. In November of 1980, the Union offered to give the residential wireman exam, but not the journeyman test, to Campbell and Walker. Union officials apparently based their decision upon the applicant's allegedly preponderant experience in the residential (rather than the commercial) field. However, Campbell's and Walker's resumes showed otherwise and, in any event, the Commercial Agreement nowhere distinguished commercial work as requisite to the journeyman examination. The applicants, moreover, would have to remain residential wiremen for three years and then take a two-year course in order to become journeymen.

After working steadily for the preceding eight months, Campbell and Walker were laid off in January of 1981. They thereupon retained an attorney to investigate the Union's inaction with respect to their union membership applications.

Thereafter, on March 19, 1981, the Union referred Ronald Turner to a job at the Claridge Hotel, although Campbell was present at the hiring hall and had registered before Turner. Turner belonged to an IBEW local in Ohio but had neither passed the journeyman's test nor completed an apprenticeship and, therefore, deserved only Group IV status. His local's reference letter nonetheless labeled Turner a journeyman. Campbell, on the other hand, was classified in Group III.

On April 30, 1981, the lawyer representing Campbell and Walker protested to the Union's counsel that the two should receive more frequent referrals without having to take a formal test and that, in light of their experience, they should not have to join the Union as apprentices.

On May 12, 1981, the Union referred Michael Barnes to Rumsey Electric although Walker was present at the hiring hall. The Union classified both men in Group III. Walker, however, had signed the daily ledger since January 19, 1981, while Barnes had not appeared at the hall until May 4, 1981.

Again, on May 20, 1981, Edward Jennings received a job referral to Calvi Electric Company. Jennings had been signing the referral ledger only since May 4, 1981, and had not satisfied the journeyman exam requirement necessary for Group I or Group II status. Campbell, as did Walker, belonged to Group III and began signing the ledger before Jennings on April 6,

1981.[2] All of the men appeared at the hiring hall on May 20.

Finally, on May 27, 1981, the Union referred James McMillon to contractors Henkels & McCoy, despite Walker's presence at the hiring hall. McMillon belonged to Group IV and had been signing the ledger only since May 6, 1981.

Some months later, on February 16, 1982, Union official Stockinger notified Campbell and Walker that the journeyman wireman's test would be offered on February 24. Campbell and Walker failed to appear, though, on the ground that they lacked sufficient time to prepare for it. By letter dated February 26, 1982, they indicated their interest in taking the exam later "if it can be arranged with at least two weeks notice...." the Union, it appears, did not respond before the hearing on these matters.

Campbell originally filed an unfair labor practice charge on September 3, 1981. On February 26, 1982, the NLRB served upon the Union a complaint and notice of hearing alleging violations of §§ 8(b)(1)(A) and 8(b)(2) deriving from, *inter alia*, out-of-sequence referrals of Campbell and Walker and from discriminatory treatment of their union membership applications. A subsequent amendment to the complaint charged that the Union had unlawfully denied Campbell and Walker the opportunity to take the journeyman's examination.

After an extended hearing, an Administrative Law Judge ("ALJ") concluded that:

By failing and refusing, since on or about December 3, 1981, to allow Robert S. Campbell and James E. Walker to take the journeyman wireman's examination, thereby denying them the opportunity to qualify for a higher priority group under the exclusive referral system maintained under its collective bargaining agreement with the Association, the Respondent has violated Section[s] 8(b)(1)(A) and (2) of the Act.

The ALJ found no other violations of the Act.

On May 30, 1981 the NLRB issued its decision and order. The Board sustained the ALJ's conclusion that the Union had wrongfully prevented Campbell and Walker from taking the journeyman wireman's test.[3] However, the Board found additional violations as follows:

(1) failing to refer Walker on 12 May and referring Michael Barnes instead, where Walker was in the same group and preceded Barnes on the referral register; (2) failing to refer either Walker or Campbell on 20 May and referring Edward Jennings instead, where both Campbell and Walker were in the same group and preceded Jennings on the register; (3) failing to refer Walker on 27 May, where Walker was at least in the same group and preceded McMillon on the register.

The Board also held that the Union violated the Act by referring Turner ahead of Campbell on March 19, 1981.

The NLRB stressed the Union's failure to demonstrate "that its interference with employment was pursuant to a valid union-security clause or was necessary to the effective performance of its representative function." *Quoting Operating Engineers Local 406 (Ford, Bacon & Davis Construction)*, 262 N.L.R.B. 50, 51 (1982). The Board, accordingly, held that "even assuming the absence of a specific discriminatory intent, ... the Respondent has violated Section[s] 8(b)(1)(A) and (2) of the Act in each case that it made referrals which did not comport with its establish[ed] hiring hall procedures," and rejected "the proposition that a union can rebut a prima facie case of unlawful referral simply by showing that its conduct was not specifically discriminatorily motivated."

The Union timely filed a notice of appeal, and the NLRB applied for enforcement of its order.

---

**2.** Campbell first signed the list on January 12, 1981. He obtained short-term employment from March 27 to April 3, 1981, but earned a discharge for "unsatisfactory performance." As a result, Campbell lost his place on the referral ledger and began signing again on April 6, 1981.

**3.** The Union does not challenge this aspect of the Board's decision on appeal.

## II.

Although the Union raises numerous arguments on appeal, these are essentially encompassed in two main points. The Union contends that the Board erred as a matter of law in holding that the out-of-sequence referrals violated the Act, since the NLRB failed to show animus by the Union toward the charging parties. Moreover, the Union insists that the NLRB erroneously awarded lost earnings to Campbell and Walker after they refused immediate referrals to comparable employment.

On review, the NLRB's findings of fact must rest upon substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). While examining the Board's conclusions of law, we should remain "[m]indful that the construction of a statute by those charged with its execution is normally entitled to deference by the courts ... and that Congress intended that the Board develop the national labor policy...." *Giacalone v. NLRB*, 682 F.2d 427, 430 (3d Cir.1982). The Board's remedy "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 *reh'g denied*, 320 U.S. 809, 64 S.Ct. 27, 88 L.Ed. 489 (1943).

## III.

At the outset, we address some clarifying points which underlie our decision. First, we do not read the Board's decision that the Union's *several* out-of-sequence assignments constituted separate violations to mean that any *one* of them would, without more, offend the Act. That issue is absent here and we need not decide it. To the contrary, the NLRB's case appears to derive from the pattern of arbitrary referrals which the charging parties suffered. Second, the assumed "absence of a *specific* discriminatory intent ..." on the Union's part does not (as the Union argues) evince that the Board drew no inference of prejudicial treatment whatever toward Campbell

and Walker. Rather, the NLRB employed an objective, instead of a subjective, standard in establishing prima facie proof of unlawful referrals by the Union. Thus, although the Board lacked a "smoking gun" with which to show discriminatory intent, the recurring failure of the Union to adhere to its hiring hall procedures sufficed to require a defense to the Board's case.

With these points in mind we address the Union's alleged points of error.

## IV.

Initially, we recall that § 8(b)(2) differs from § 8(b)(1)(A). The former focuses on discriminatory treatment while the latter proscribes union-related coercion of employees. *See Local 277, Int'l Bhd. of Painters and Allied Trades v. NLRB*, 717 F.2d 805, 808–09 (3d Cir.1983). Thus, the specific practices by which the Board proves a breach of one section might not suffice to evidence a violation of the other. Nothing in the Act, however, prevents the Board from using the same acts to charge violations of both statutory provisions.

Although the Union admits that an unfair labor practice exists where a union refers one worker ahead of another on account of union ties, the Union nonetheless avers that the NLRB failed to show union-based animus toward the charging parties here. We find, though, that a preponderance of the evidence demonstrates a violation of § 8(b)(2) and § 8(b)(1)(A) of the Act.

### A.

Concededly, "unexplained out-of-order referrals, ... which might in some circumstances constitute persuasive evidence of discriminatory intent, do not in themselves constitute violations of the Act unless and until the Board finds by substantial evidence that the referral was in fact based upon union membership or activity...." *NLRB v. Local 483 and Local 11, Int'l Assoc. of Bridge, Structural and Ornamental Ironworkers*, 672 F.2d 1159, 1165 (3d Cir.1982). Yet, even in *Local 483 and*

*Local 11,* we noted that "a union's disregard of the contractual rules for operation of a hiring hall has been considered to be strong evidence of unlawful discrimination" in violation of § 8(b)(2). *Id.* at 1165 n. 14. *See also Local 277,* 717 F.2d at 810 n. 5 (explaining that breach of contractual hiring hall procedure evidences unlawful discrimination).

The Supreme Court's opinion in *Radio Officers' Union of the Commercial Telegraphers Union v. NLRB,* 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954), is likewise instructive. There, in discussing § 8(a)(3),[4] the Court noted that *"specific* evidence of intent to encourage or discourage is not an indispensable element of proof of violation of § 8(a)(3)." *Id.* at 44, 74 S.Ct. at 338, emphasis added. The Court continued:

> This recognition that specific proof of intent is unnecessary where employer conduct inherently encourages or discourages union membership is but an application of the common-law rule that a man is held to intend the foreseeable consequences of his conduct. [Citations omitted.] Thus an employer's protestation that he did not intend to encourage or discourage must be unavailing where a natural consequence of his action was such encouragement or discouragement. Concluding that encouragement or discouragement will result, it is presumed that he intended such consequence.

*Id.* at 45, 74 S.Ct. at 338. *See Local 483 and Local 11,* 672 F.2d at 1165.

Here, the record shows that Campbell and Walker tried to join the Union on May 1, 1980. Although Union official Stockinger indicated that they could apply one week later, the charging parties had to employ an attorney to investigate the Union's inaction regarding their applications as late as January of 1981. Moreover, the Union repeatedly referred Campbell and Walker out of sequence from March through May of 1981. It remains unclear, in fact, whether they have ever become Union members. Presented with this evidence, the Board

could rationally infer in light of its experience an unlawful attempt to restrain Campbell's and Walker's rights of organization. *See* 29 U.S.C. § 158(b)(1)(A) (1982).

We find unpersuasive, therefore, the argument that the NLRB unreasonably predicated union-related animus upon the Union's referrals of other non-union electricians ahead of Campbell and Walker. In addition to the evidence that Campbell and Walker were wrongfully restrained from IBEW membership, the Board reasonably could conclude that the Union's actions effectively demonstrated its power among the other non-union workers and, thereby, prodded them to join the IBEW. *See NLRB v. Local 433, Int'l Assoc. of Bridge, Structural and Ornamental Iron Workers,* 600 F.2d 770, 777 (9th Cir.1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980).

Nor does the NLRB's decision impermissibly shift to the Union the burden of disproving an element of the unfair labor practice charge. The Supreme Court recently clarified in *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), that, although the Board must establish the § 8 violation, the Act nowhere excuses the charged party from proffering legitimate reasons to rebut or to defend against the prima facie case. *See id.* at 401–04, 103 S.Ct. at 2474–75. Nothing more occurred here.

Therefore, we hold that the record supports the NLRB's decision. Substantial evidence exists to show Union restraint of Campbell and Walker in violation of § 8(b)(1)(A) and union-based discrimination against them contrary to § 8(b)(2).

### B.

The Union also contests the NLRB's order awarding Campbell and Walker lost earnings. In support of its position, the Union avers that they declined immediate referrals to comparable employment.

---

**4.** Title 29 U.S.C. § 158(a)(3) generally outlaws encouragement or discouragement of union membership by discrimination with respect to hiring or tenure of employment or any term or condition thereof.

However, the Board itself concedes in its brief that the Union will have the opportunity during the remedy phase of the Board's proceedings to adduce evidence bearing upon the amount of any damages to Campbell and Walker. The NLRB, in fact, cites as an example of a mitigating factor "that Campbell and Walker willfully refused opportunities to obtain interim employment...." In short, since the Board has yet to fix the amount of money (if any) due to the charging parties, the Union's attack upon the NLRB's make-whole remedy is premature.

We have considered the rest of the Union's contentions and find them to be without merit.

### V.

We will enforce the Board's order in full.