PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3440
_____

NATIONAL LABOR RELATIONS BOARD,
                              Petitioner

1199 SEIU UNITED HEALTHCARE WORKERS EAST,
N.J. REGION,
                              Intervenor
v.

NEW VISTA NURSING AND REHABILITATION,
                              Respondent


_____

Nos. 12-1027 & 12-1936
_____

NEW VISTA NURSING AND REHABILITATION, LLC,
                              Petitioner
v.

NATIONAL LABOR RELATIONS BOARD,
                              Respondent
1199 SEIU UNITED HEALTHCARE WORKERS EAST,
N.J. REGION,

Intervenor

_____

On Application for Enforcement of an Order of the
National Labor Relations Board &
Cross-Petitions for Review
(NLRB-22-CA-29988)

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
After Remand to the NLRB and Supplemental Briefing
on May 6, 2016


Before: SMITH, *Chief Judge*, GREENAWAY, JR., and
FISHER, *Circuit Judges*

(Filed: August 29, 2017)

Beth S. Brinkmann
Melissa N. Patterson
United States Department of Justice
Civil Division
Room 3135
950 Pennsylvania Avenue, N.W.
Washington, DC  20530

Julie B. Broido
Linda Dreeben
Milakshmi V. Rajapakse
National Labor Relations Board

1015 Half Street SE
Washington, DC  20570

Scott R. McIntosh
United States Department of Justice
Civil Division
Room 7259
950 Pennsylvania Avenue, N.W.
Washington, DC  20530

Benjamin M. Shultz
United States Department of Justice
Civil Division
Room 7211
950 Pennsylvania Avenue, N.W.
Washington, DC  20530

William S. Massey
Gladstein Reif & Meginniss
817 Broadway
6th Floor
New York, NY  10003
     *Counsel for Petitioner*

Louis J. Capozzi, Jr.
Capozzi Adler
1200 Camp Hill Bypass
Camp Hill, PA  17011

Morris Tuchman
2nd Floor

134 Lexington Avenue
New York, NY 10016
    *Counsel for Respondent*

Victor Williams
Catholic University of America
School of Law
Faculty Suite 480
3600 John McCormack Road, N.E.
Washington, DC 20064
    *Counsel for Amicus-petitioner*

———————————

OPINION
———————————

SMITH, *Chief Judge.*


Respondent-Petitioner New Vista Nursing and Rehabilitation, LLC ("New Vista"), contends that the licensed practical nurses ("LPNs") employed at its nursing home could not unionize because they were "supervisors." The LPNs are supervisors, New Vista argues, because they have the "authority" to "discipline other employees[] . . . or effectively to recommend such action." 29 U.S.C. § 152(11). New Vista explains that the LPNs had such authority because their duties included filling out forms known as "Employee Warning Notices" or "Notices of Corrective Action," which

4

recommended discipline for certified nursing assistants ("CNAs").

After New Vista refused to bargain with the LPNs' union, the National Labor Relations Board (the "Board") held that New Vista's refusal to bargain was unlawful because, among other things, the nurses did not have the authority to effectively recommend discipline. To determine whether the LPNs had such authority, the Board applied a four-part test squarely at odds with our controlling precedent—specifically *NLRB v. Attleboro Associates, Ltd.*, 176 F.3d 154 (3d Cir. 1999). Therefore, we will deny the Board's petition for enforcement and grant New Vista's cross-petitions for review. In doing so, we will remand this case to the Board to allow it to determine whether the LPNs have the authority to effectively recommend discipline under *Attleboro*.

Before we can move to the analysis by which the Board should determine whether the LPNs are statutory supervisors, we will first address the sundry procedural arguments advanced by New Vista. After the Supreme Court's decision in *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), and our post–*Noel Canning* remand to the Board to clear up procedural and jurisdictional issues, we conclude that New Vista's procedural arguments are meritless.

## BACKGROUND

There are three levels of nursing staff at the New Vista home who are supervised by the Director of Nursing: (1) the

5

"nursing supervisor" during the evening shift or "unit manager" during the morning shift; (2) LPNs[1]; and (3) "Certified Nurse Aides" also known as "certified nursing assistants" or "CNAs." *See New Vista Nursing & Rehab., LLC*, 357 N.L.R.B. 714, 715 (2011); JA0073–75; JA0079; JA0881. In January 2011, 1199 SEIU United Healthcare Workers East (the "Union") filed a petition to represent the LPNs.[2]

The Board approved the bargaining unit and required that an election be held to determine whether the Union

---

[1] Registered nurses or "RNs" interchangeably occupy the same position as the LPNs. *See, e.g.*, *New Vista Nursing & Rehab., LLC*, Case No. 22-RC-13204, slip op. at 4 (Mar. 9, 2011) (regional director's decision) ("One nurse (either an RN or an LPN) is assigned to each unit on the floor . . . ."), *available                                           at* http://apps.nlrb.gov/link/document.aspx/09031d458045c16b, *request for review denied* (Apr. 8, 2011), *available at* http://apps.nlrb.gov/link/document.aspx/09031d4580471 8e4; JA0074 ("They could be an RN or an LPN."). We use record citations for Regional Director J. Michael Lightner's order, JA0848–80; *New Vista Nursing & Rehab., LLC*, No. 22-RC-13204 (Mar. 9, 2011). A copy of the order and the denial of the request for review can be accessed at the above URLs.

[2] The CNAs are already represented by the Union. *See, e.g.*, JA0180.

would serve as the LPNs' bargaining representative. JA0848–50, 0878–79.  The bargaining unit was defined to include "[a]ll full-time and regular part-time Licensed Practical Nurses employed by the Employer at its Newark, New Jersey facility, excluding all other employees, guards, and supervisors as defined by the Act."  JA0849–50.

One of New Vista's main objections to the bargaining unit was that the LPNs were supervisors under 29 U.S.C. § 152(11) because they have the "authority" to "discipline other employees[] . . . or effectively to recommend such action."  If they were supervisors, the LPNs would not have a statutory right to be represented in collective bargaining.  *See* 29 U.S.C. § 152(3) ("The term 'employee' . . . shall not include . . . any individual employed as a supervisor . . . ."); *see also NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 718 (2001) ("The Labor Management Relations Act, 1947 (Taft-Hartley Act) expressly excluded 'supervisors' from the definition of 'employees' and thereby from the protections of the Act.").  To determine whether an individual is a supervisor, the Supreme Court has provided a three-part test:

> Employees are statutory supervisors if (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions [in 29 U.S.C. § 152(11)], (2) their "exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment," and (3) their authority is held "in the interest of the employer."

7

*Ky. River*, 532 U.S. at 713 (quoting *NLRB v. Health Care & Ret. Corp. of Am.*, 511 U.S. 571, 573–74 (1994)). One of the twelve listed supervisory functions is "disciplin[ing] other employees." 29 U.S.C. § 152(11).

New Vista argued that it showed that the LPNs effectively have the power to discipline other employees because LPNs submitted disciplinary forms known as a "Notice of Corrective Action" or "Employee Warning Notice." *E.g.*, JA0872–73, JA0884–86.

The facts surrounding these forms were fiercely contested. *See* JA0856–0862. Some testimony suggested LPNs did not use the forms to effectively recommend discipline. One of the nurses had never seen the Employee Warning Notice until just prior to her testimony. *See* JA0276; *see also* JA0329. Similarly, testimony by another nurse was that LPNs rarely (if ever) recommended a specific kind of discipline. *See* JA0330.

There was, however, countervailing evidence that supported New Vista's position. Most notably, Director of Nursing Victoria Alfeche testified that LPNs, in the exercise of their own discretion, frequently filled out these forms. Further, Alfeche explained that LPNs could recommend a specific type of discipline and that she acted on the forms as a matter of course. *See* JA0098–99, 0148.

In his March 9, 2011 order, NLRB Regional Director J. Michael Lightner rejected New Vista's argument, applying a four-part test based on a vacated NLRB opinion: "To prevail, the Employer must prove that: (a) LPNs submit

8

actual recommendations, and not merely anecdotal reports, (b) their recommendations are followed on a regular basis, (c) the triggering disciplinary incidents are not independently investigated by superiors, and (d) the recommendations result from the LPNs' own independent judgment." JA873 (citing *ITT Lighting Fixtures*, 265 N.L.R.B. 1480, 1481 (1982), *vacated on other grounds sub nom. ITT Lighting Fixtures, Div. of ITT Corp. v. NLRB*, 712 F.2d 40 (2d Cir. 1983)). Director Lightner's conclusion rested heavily on his finding that LPNs "simply report[ed] factual findings to their superiors without any specific recommendation for disciplinary action" and that the "higher authorities" at New Vista proceeded with independent investigations upon receiving the forms. *See* JA0873–74. Director Lightner also noted that there were very few examples in the record of LPNs who filled out the forms other than Grace Tumamak. *See* JA0875. Director Lightner further found that forms filled out by Ms. Tumamak could not show the authority of other LPNs because Ms. Tumamak served as the unit manager on one shift and as an LPN on another. *See* JA0850.

The election to determine whether the Union would serve as the LPNs' bargaining representative was held on April 8, 2011. *See* JA0039. A majority of LPNs voted to be represented by the Union by a vote of 26 to 7. *See id.* Four additional votes were challenged. *See id.*

That same day, the Board denied New Vista's request for review of Director Lightner's order that directed the election would occur. *See* JA0911, *available at* http://apps.nlrb.gov/link/document.aspx/09031d45804718e4.

9

Because such denials are nonreviewable, New Vista pursued the standard course of testing the Union's certification by refusing to bargain. *See NLRB v. FedEx Freight, Inc.*, 832 F.3d 432, 435 n.1 (3d Cir. 2016); JA0021; JA0042 ("Dear All; We are testing the certification and will not be bargaining."). New Vista asserted that the LPNs were statutory supervisors and, even if they had not been prior to the certification, they were as of March 25, 2011, because of a change in the LPNs' duties. *See* JA0049, 0053.

In a decision and order dated August 26, 2011, the Board (Liebman, Becker, Hayes)[3] unanimously granted summary judgment in favor of the Union and against New Vista. *See New Vista Nursing & Rehab., LLC*, 357 N.L.R.B. 714.

The Board's order granting summary judgment on the refusal to bargain charge and many of its subsequent orders denying New Vista's motions for reconsideration took place during what may fairly be described as unusual times for the

---

[3] Member Pearce recused. *See New Vista Nursing & Rehab., LLC*, 357 N.L.R.B. 714, 714 n.1 (2011). Throughout this opinion, we frequently note which Board members voted on particular orders. We do so because many of New Vista's challenges go to whether certain members had already resigned, were illegally appointed, or should have recused from a particular decision—not because the identity of the Board is of significance for any other reason.

10

Board. The political branches had not filled many of the vacancies on the Board. This led then-President Obama to make a series of recess appointments to fill the vacancies. *See NLRB v. Noel Canning*, 134 S. Ct. 2550, 2557–58 (2014) (describing the recess appointments); *id.* at 2557 ("As of January 2012, Flynn's nomination had been pending in the Senate awaiting confirmation for approximately a year."). As is relevant here, there were two different sets of recess appointments: (1) Craig Becker was recess appointed to the Board in 2010, and (2) Sharon Block, Terence Flynn, and Robert Griffin were all recess appointed in 2012. *See NLRB v. New Vista Nursing & Rehab.*, 719 F.3d 203, 213 (3d Cir. 2013), *abrogated by Noel Canning*, 134 S. Ct. 2550; *id.* at 244–45 (Greenaway, Jr., J., dissenting).

As described below, if there are an insufficient number of Board Members, the Board will be unable to muster a quorum. Without a quorum, the Board cannot issue legally enforceable orders. The National Labor Relations Act ("NLRA") provides that the Board shall have five members. 29 U.S.C. § 153(a). As the Supreme Court has held, there are three Board quorums, of which the first and third must exist for any given NLRB decision to be valid under 29 U.S.C. § 153(b). *See generally New Process Steel, L.P. v. NLRB*, 560 U.S. 674 (2010). First, **three** members of the Board constitute a quorum of the entire Board. *See* 29 U.S.C. § 153(b) ("[T]hree members of the Board shall, at all times, constitute a quorum of the Board . . . ."); *New Process Steel*, 560 U.S. at 680 ("Interpreting the statute to require the Board's powers to be vested at all times in a group of at least three members is consonant with the Board quorum

11

requirement, which requires three participating members 'at all times' for the Board to act." (quoting 29 U.S.C. § 153(b)). Second, the Board may delegate its power to a ***three***-member group.  *See* 29 U.S.C. § 153(b) ("The Board is authorized to delegate to any group of three or more members any or all of the powers which it may itself exercise."); *New Process Steel*, 560 U.S. at 679 ("The first sentence of § 3(b), which we will call the delegation clause, provides that the Board may delegate its powers only to a 'group of three or more members.'" (quoting Labor Management Relations Act, 1947, § 3(b), Pub. L. No. 80-101, 61 Stat. 136, 139 (codified as amended at 29 U.S.C. § 153(b))).  Third, ***two*** members of any three-member group constitute a quorum of a three-member group.  *See* 29 U.S.C. § 153(b) ("[T]wo members shall constitute a quorum of any group designated pursuant to the first sentence hereof."); *New Process Steel*, 560 U.S. at 681 ("[T]he group quorum provision, which still operates to authorize a three-member delegee group to issue a decision with only two members participating, so long as the delegee group was properly constituted.").  The two-member quorum of a three-member group ceases to exist as a viable quorum when the Board has fewer than two members.  *See New Process Steel*, 560 U.S. at 679.

On September 7, 2011, New Vista began filing the first of what would ultimately be five motions for reconsideration, arguing that the Board acted ultra vires because it had too few Members either serving or involved in a particular decision.

In its First Motion for Reconsideration, New Vista argued that the August 26, 2011 order was ultra vires because

it was posted on the Board's website after the expiration of the term of one of its signing members—then-Chairman Wilma Liebman. According to New Vista, if Chairman Liebman had not legally participated in the August 26, 2011 order, the delegee group only consisted of two members in violation of 29 U.S.C. § 153(b). *See* JA0051. New Vista also argued it was entitled to a hearing to investigate changed circumstances in the LPNs' authority to supervise, pursuant to *Frito-Lay, Inc.*, 177 N.L.R.B. 820 (1969).

On September 13, 2011, the Board filed an application for enforcement of its August 26, 2011 order with this Court. *See* JA0001.

On December 30, 2011, the Board (Becker, Hayes) denied New Vista's First Motion for Reconsideration. As to Chairman Liebman, the Board explained that the August 26, 2011 order was made final prior to the August 27 end of Chairman Liebman's term and that the Board's subsequent acts with regard to the August 26, 2011 order were ministerial. *See* JA0012–14. With regard to the *Frito-Lay* argument, the Board rejected it "[f]or the reasons set forth in the Board's August 26, 2011 Decision and Order." JA0014.

On January 3, 2012, New Vista filed its Second Motion for Reconsideration. The Second Motion argued that the December 30, 2011 order denying the First Motion for Reconsideration was not decided by a "proper quorum" because one of the three members of the panel, Chairman Pearce, had recused. *See* JA0055–57. Because the panel consisted only of Members Becker and Hayes, it was, according to New Vista, improperly constituted.

13

On January 9, 2012, New Vista filed a petition for review of the December 30 order with this Court. See JA0002–03. We have treated this petition as a cross-petition for review opposing the Board's petition for enforcement of the August 26, 2011 order.

On March 14, 2012, New Vista filed its Third Motion for Reconsideration. New Vista argued that the Board's December 30, 2011 order denying the First Motion for Reconsideration was ultra vires because Member Becker's recess appointment ended on December 17, 2011. According to New Vista, the Board (Becker, Hayes) lacked a two-person quorum to issue its December 30, 2011 order. *See* JA0058–59.

On March 15, 2012, the Board (Hayes, Griffin, Block) denied New Vista's Second Motion for Reconsideration. The Board held that there was a quorum for the December 30, 2011 order denying the First Motion for Reconsideration. Specifically, the March 15, 2012 order relied on the fact that, pursuant to *New Process Steel*, a two-member quorum of a panel can issue legally enforceable orders. *See* JA0015–16. The March 15, 2012 order quoted from the December 30, 2011 order showing that Pearce engaged in the delegation of power to the two-member quorum and then recused. *See* JA0016 ("Chairman Pearce, who is recused and did not participate in the underlying decision, is a member of the present panel but did not participate in deciding the merits of this proceeding.").

On March 22, 2012, New Vista filed its Fourth Motion for Reconsideration, arguing that Members Griffin and Block

14

were not Board members on March 15, 2012 because they had been illegally appointed during an intrasession recess. *See* JA60–61. New Vista again argued that the December 30, 2011 order was improper because Becker was no longer a Board member on December 30, 2011. *See id.*

On March 27, 2012, the Board (Hayes, Griffin, Block) denied the Third and Fourth Motions for Reconsideration. *See* JA0017–18. The Board stated that the Board properly delegated its authority to a three-member panel and would "not entertain any further motions for reconsideration challenging the authority of the Board in this matter." *Id.*

On April 5, 2012, New Vista filed a petition for review of the March 15 and March 27 orders. *See* JA0004–06. We granted New Vista's request that this petition be consolidated with New Vista's earlier petition for review for all purposes. These consolidated petitions for review are collectively treated as a cross-petition opposing the Board's petition for enforcement of the August 26, 2011 order.

On May 16, 2013, we ruled on the Board's petition and New Vista's cross-petitions, holding that the "delegee group acted without power and lacked jurisdiction" when it issued the August 26, 2011 order because Becker's recess appointment was invalid. *New Vista*, 719 F.3d at 221, 244. Specifically, we held that recess appointments were legal only when made during Congress's "intersession breaks." *Id.* at 208.

Shortly thereafter, the Board filed a petition for rehearing en banc. On July 16, 2013, we stayed further

15

consideration of *New Vista* pending the Supreme Court's resolution of *Noel Canning v. NLRB*, 705 F.3d 490 (D.C. Cir. 2013), which also addressed the legality of recess appointments to the Board. *See* Order, No. 12-1027 (3d Cir. filed July 15, 2013).

On June 26, 2014, the Supreme Court issued its decision in *Noel Canning*. 134 S. Ct. 2550. The Supreme Court held that, as used in the Appointments Clause, "the phrase 'the recess'" is not limited to recesses between congressional sessions. *Id.* at 2561. Recess appointments could be made during an intrasession recess, but such a recess that is "less than 10 days is presumptively too short to fall within the Clause." *Id.* at 2567. Further, "*pro forma* sessions" are not "periods of recess," so no recess appointments could be made during any intrasession recess punctuated by pro forma sessions fewer than ten days apart. *Id.* at 2574.

Applying those rules, the Supreme Court held that Griffin's and Block's recess appointments were invalid. When Griffin and Block received their recess appointments, the Senate had been holding "*pro forma* sessions every Tuesday and Friday." *Id.* at 2557. Because these pro forma sessions limited the length of the intrasession recess, the resulting 3-day recesses were "too short to trigger the President's recess-appointment power." *Id.* at 2574.

At the same time, the Supreme Court implied that Member Becker's appointment was valid because it was made during a two-week intrasession recess. *See id.* at 2558 ("The President appointed Member Becker during an intra-

session recess that was not punctuated by *pro forma* sessions, and the vacancy Becker filled had come into existence prior to the recess."); *see also New Vista*, 719 F.3d at 213 ("Member Becker . . . was appointed on March 27, 2010, one day after the Senate 'adjourn[ed]' for two weeks." (quoting 156 Cong. Rec. S2180 (daily ed. Mar. 26, 2010) (statement of Sen. Kaufman)).

Following the Supreme Court's *Noel Canning* decision, we granted the Board's motion for panel rehearing. In response to this Court's questions, the Board admitted it "undisputedly lacked a quorum" for its March 15, 2012, and March 27, 2012 orders.[4] Motion of the National Labor Relations Board for Limited Remand of the Administrative Record, No. 11-3440, Doc No. 003112144322 (3d Cir. Dec. 2, 2015). The Board requested that we remand the administrative record so that it could rule on the motions for reconsideration it denied in March 2012. *See id.* We granted

---

[4] Because the Board undisputedly lacked a quorum in March 2012, this Court may have lacked jurisdiction over this case had we not remanded because submitting the record creates jurisdiction in this Court, 29 U.S.C. § 160(e) ("Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final."), and the Board may have lacked the power to submit the record when it did so on March 27, 2012, *see* NLRB Certified List Transmitted, No. 11-3440 (3d Cir. filed Mar. 27, 2012).

the motion for remand.  *See* Order, No. 11-3440 (3d Cir. filed Dec. 4, 2015).

On remand, the Board (Miscimarra, Hirozawa, McFerran) again denied New Vista's Second and Third Motions for Reconsideration on the merits and then denied New Vista's Fourth Motion for Reconsideration as moot. SA14–18.

New Vista then filed a Fifth Motion for Reconsideration, arguing a lack of transparency and that there was no valid quorum to enter the most recent order because Member Hirozawa should have recused himself.  Among other things, New Vista claimed that Member Hirozawa's former law firm represented the Union in this case.  *See* SA19–20.  On January 5, 2016, the Board denied the Fifth Motion for Reconsideration, with Member Hirozawa denying the request for recusal.  *See* SA21–26.  The Board explained that New Vista knew that the Board planned to review the Fourth Motion for Reconsideration "expeditiously."  SA23. As to recusal, the Board referred New Vista to an attached statement by Member Hirozawa.  *See id.*  Member Hirozawa explained that he did not recuse because, among other things, he had no involvement with "this matter or any other matter concerning" New Vista while in private practice and his first work on this case was more than five years after he left his previous firm.  *See* SA24–26.

Following New Vista's denial of the Fifth Motion for Reconsideration, we ordered supplemental briefing and requested a supplemental appendix.  *See* Order, No. 11-3440 (3d Cir. filed Jan. 21, 2016).  Having received this

18

supplemental material, we now review the Board's petition for enforcement and New Vista's cross-petitions for review.

## JURISDICTION

We have jurisdiction over the Board's petition for enforcement pursuant to 29 U.S.C. § 160(e) and jurisdiction over New Vista's petitions to review the Board's final order pursuant to 29 U.S.C. § 160(f). *See 800 River Rd. Operating Co. LLC v. NLRB*, 784 F.3d 902, 906 (3d Cir. 2015).

## STANDARD OF REVIEW

"The Board's legal determinations are subject to plenary review, but we will uphold the Board's interpretations of the Act if they are reasonable." *MCPc Inc. v. NLRB*, 813 F.3d 475, 482 (3d Cir. 2016) (citing *Mars Home for Youth v. NLRB*, 666 F.3d 850, 853 (3d Cir. 2011)). "[W]e will accept the Board's factual findings and the reasonable inferences derived from those findings if they are 'supported by substantial evidence on the record considered as a whole.'" *Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 606 (3d Cir. 2016) (quoting 29 U.S.C. § 160(f)). Where the Board has adopted the Regional Director's findings, we perform our substantial evidence review of the Regional Director's findings. *See MCPc*, 813 F.3d at 482.

We review a Board member's decision whether to recuse under an abuse-of-discretion standard, reversing only when a decision is "arbitrary or unreasonable." *1621 Route 22 W. Operating Co., LLC v. NLRB*, 825 F.3d 128, 143–44 (3d Cir. 2016).

19

## DISCUSSION

To put it mildly, motions for reconsideration have piled up in this case. The following table shows the tangled nature of the five motions for reconsideration:

Orders and Motions under Consideration

| Motion for Reconsideration | Requests Reconsideration of Which Order | Grounds | Result |
|---|---|---|---|
| First Motion for Reconsideration, *see* JA0051–54 | August 26, 2011 (Liebman, Becker, Hayes) | Liebman resigned before the order was issued and the Board was required to consider changed facts under *Frito-Lay*. | Denied on December 30, 2011 (Becker, Hayes). *See* JA0012–14. |
| Second Motion for Reconsideration, *see* JA0055–57 | December 30, 2011 | There was no quorum because Chairman Pearce had recused. | Denied on March 15, 2012 (Hayes, Griffin, Block), *see* JA0015–16, and again on December 17, 2015 (Miscimarra, Hirozawa, McFerran), *see* SA14–18. |
| Third Motion for Reconsideration, *see* JA0058–59 | December 30, 2011 | Becker's recess appointment was invalid. | Denied on March 27, 2012 (Hayes, Griffin, Block), *see* JA0017–18, and again on December 17, 2015 (Miscimarra, Hirozawa, McFerran), *see* SA14–18. |
| Fourth Motion for Reconsideration, *see* JA0060–61 | March 15, 2012 | Either Becker's recess appointment was invalid on December 30, 2011, or Griffin and Block's recess appointments were invalid on March 15. | Denied on March 27, 2012 (Hayes, Griffin, Block), *see* JA0017–18, and again on December 17, 2015 (Miscimarra, Hirozawa, McFerran), *see* SA14–18. |
| Fifth Motion for Reconsideration, SA19–20 | December 17, 2015 | The December 17, 2015 order came without seeking New Vista's input and Member Hirozawa should have recused. | Denied on January 5, 2016 (Miscimarra, Hirozawa, McFerran). *See* SA21–26. |

We will address the motions for reconsideration in reverse chronological order. In resolving all of these motions, as we do, in favor of the Board, we conclude that we must remand so that the Board may apply an appropriate test to determine whether the LPNs have the authority to discipline other employees.

## I. THE FIFTH MOTION FOR RECONSIDERATION (RESOLVED IN THE BOARD'S JANUARY 5, 2016 ORDER)

New Vista's Fifth Motion for Reconsideration alleged that the Board's December 17, 2015 order was invalid because (1) New Vista did "not even know the Board was considering the matter"—in its brief, New Vista frames this as a "lack of transparency," New Vista Supp. Br. 5[5]—and (2) Member Hirozawa should have recused. *See* SA19. Both arguments fail.

---

[5] We cite to the parties' responsive briefs following the order granting rehearing and filed September 29, 2014 (New Vista), November 25, 2014 (NLRB), and December 9, 2014 (New Vista), as "New Vista Rehearing Br.," "NLRB Rehearing Br.," and "New Vista Rehearing Reply," respectively. We cite to the parties' responsive briefs following the supplementation and resubmission of the record and filed February 22, 2016 (New Vista), March 23, 2016 (NLRB), and April 6, 2016

First, with regard to the Board's "transparency," New Vista now argues that there were two failures: (a) the Board acted with "great alacrity" in resolving the Fourth Motion for Reconsideration in its January 5, 2016 order, New Vista Supp. Br. 1–2, and (b) the Board engaged in unlawful ex parte communication with its general counsel prior to resolving the Fourth Motion for Reconsideration, *see* New Vista Supp. Br. 2–5. The first argument does not present any legal deficiency and we do not have jurisdiction to address the second because it was not presented to the Board. If we had jurisdiction, we would find this argument unavailing.

With regard to the Board's "alacrity" in resolving the Fourth Motion for Reconsideration or failure to tell New Vista that it would soon be resolving the Fifth Motion for Reconsideration, New Vista fails to present any factual or legal basis for overturning the January 5, 2016 order. First, New Vista provides no legal hook on which to hang its grievance. And with regard to the facts, there is substantial evidence to support a finding that New Vista knew that the Board planned to act expeditiously. The Board had previously advised this Court it would resolve New Vista's outstanding motions within thirty days. *See* SA4. Accordingly, the Board is

---

(New Vista), as "New Vista Supp. Br.," "NLRB Supp. Br.," and "New Vista Supp. Reply," respectively.

23

entitled to the benefit of the presumption of regularity. *See Kamara v. Att'y Gen.*, 420 F.3d 202, 212 (3d Cir. 2005).

With regard to the ex parte communications argument, we lack jurisdiction to consider this argument because New Vista failed to raise this argument before the Board. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); *FedEx Freight*, 832 F.3d at 437 ("The crucial question in a section 160(e) analysis is whether the Board received adequate notice of the basis for the objection." (internal quotation marks omitted) (quoting *FedEx Freight, Inc. v. NLRB*, 816 F.3d 515, 521 (8th Cir. 2016))); *id.* at 448 ("[T]he Court of Appeals lacks jurisdiction to review objections that were not urged before the Board . . . ." (quoting *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982))). New Vista only argued in its motion (and the Board only addressed in its order) that the Board ruled too expeditiously and without notice. *See* SA19; SA23 (addressing only New Vista's contentions that it was unaware that its reconsideration motion was being considered and that the Board ruled on the reconsideration motion too quickly).

24

Were we to reach New Vista's ex parte communication argument, we would rule for the Board. The Board's General Counsel alternates between two dramatically different roles in a labor litigation, depending on whether it is prosecuting a case before the Board or representing the Board in court. As a result, the General Counsel's communications are only ex parte when it prosecutes a case—not when it acts as the Board's counsel in a court proceeding pursuant to a petition for enforcement or petition for review.[6] Here,

---

[6] *See* 29 C.F.R. § 102.126(a) (2016) ("No interested person outside this agency shall, in an on-the-record proceeding of the types defined in § 102.128, make or knowingly cause to be made any prohibited ex parte communication to Board agents of the categories designated in that section relevant to the merits of the proceeding."); 29 C.F.R. § 102.127(a) (2016) ("The term person outside this agency, to whom the prohibitions apply, shall include . . . the general counsel or his representative ***when prosecuting an unfair labor practice proceeding before the Board pursuant to section 10(b) of the Act***." (emphasis added)); 29 C.F.R. § 102.130 (2016) ("Ex parte communications prohibited by § 102.126 shall not include[] . . . [o]ral or written communications from the general counsel to the Board ***when the general counsel is acting as counsel for the Board***." (emphasis added)).

25

the allegedly ex parte communications occurred on November 25, 2015, and December 2, 2015. *See* New Vista Supp. Br. 3. Both communications were made prior to this Court's remand of the proceeding to the Board on December 4, 2015. Therefore, at the time the General Counsel communicated to the Board, the General Counsel was operating in his capacity as "counsel for the board." 29 C.F.R. § 102.130(f) (2016). By definition, his communications could not have been ex parte.

Second, New Vista argues that Member Hirozawa should have recused for four reasons: (1) Member Hirozawa worked for Gladstein, Reif & Meginniss, LLP ("Gladstein"), prior to joining the Board, and Gladstein served as counsel for the Union in the instant matter; (2) in his previous position at the Board, Member Hirozawa worked as chief counsel for Chairman Pearce who also worked for Gladstein; (3) Member Hirozawa's successor as counsel for Chairman Pearce actually represented the Union in this matter; and (4) Member Hirozawa may return to Gladstein. *See* New Vista Supp. Br. 6–10.

Member Hirozawa did not abuse his discretion by choosing not to recuse. *See 1621 Route 22 W. Operating Co.*, 825 F.3d at 143–44 ("We review an agency member's decision not to recuse himself from a proceeding under a deferential, abuse of discretion

26

standard." (quoting *Metro. Council of NAACP Branches v. FCC*, 46 F.3d 1154, 1164 (D.C. Cir. 1995))).

It was not unreasonable for Member Hirozawa to conclude that he did not need to recuse because he had not personally represented the Union in this matter and had been away from Gladstein for more than five years before having any involvement in the instant matter. *See* SA25; *cf. United States v. Dansker*, 537 F.2d 40, 53–54 (3d Cir. 1976) (holding that a judge did not need to recuse when the judge previously investigated a company with which the criminal defendants were associated because the criminal defendants' allegations "merely evidence 'an impersonal prejudice, (going) to the judge's background and associations rather than his appraisal of the (movants) personally'"), *abrogated on other grounds by Griffin v. United States*, 502 U.S. 46, 57 n.2 (1991).

New Vista's argument that Member Hirozawa should recuse because his *successor* as chief counsel to Chairman Pearce represented the Union in this matter and previously worked with Member Hirozawa provides no more reason for Member Hirozawa to recuse than the above-rejected argument that Member Hirozawa worked at Gladstein.

Finally, New Vista suggests that Member Hirozawa should recuse because of the possibility that he may return to Gladstein. *See* New Vista Supp. Reply 3 ("[H]e could be back at his old, nine member, firm while

27

this case is still *sub judice* before this court .[sic]"). This is rank speculation and it cannot therefore create an appearance of impropriety. *See Air Line Pilots Ass'n, Int'l v. U.S. Dep't of Transp.*, 899 F.2d 1230, 1232 (D.C. Cir. 1990) (holding that "[t]he political branches of government, so far as we can tell, have never authorized as an ethical requirement" that the Secretary of Transportation be "disqualif[ied] from any matter affecting a client of a prospective employer").

Because the Board's speed in resolving the Fourth Motion for Reconsideration was not unlawful and because Member Hirozawa did not abuse his discretion when he decided not to recuse, the Board correctly denied New Vista's Fifth Motion for Reconsideration.

## II. THE SECOND, THIRD, AND FOURTH MOTIONS FOR RECONSIDERATION (THE DECEMBER 17, 2015 ORDER)

### A. The Fourth Motion for Reconsideration

In its Fourth Motion for Reconsideration, New Vista argued that, under alternate readings of the Recess Appointments Clause, either (a) Member Becker was not a Member when he joined in the December 30, 2011 order (addressing the Second Motion for Reconsideration) or (b) Members Griffin and Block were not members when they joined in the March 15, 2012 order (addressing the Third Motion for Reconsideration).

28

*See* JA0061. According to New Vista, if the Senate "recessed" when it began having pro forma sessions, Becker's recess appointment from the previous Session terminated. But, New Vista's argument goes, if the Senate were not in recess, Griffin and Block could not be appointed. *See id.*

In its December 17, 2015 order, the Board (Miscimarra, Hirozawa, McFerran) mooted New Vista's Fourth Motion for Reconsideration by reaffirming the reasoning in its previous orders addressing New Vista's Second and Third Motions for Reconsideration. *See* SA17–18. The December 17, 2015 panel was lawfully constituted. C*f. Greater Omaha Packing Co., Inc. v. NLRB*, 790 F.3d 816, 825 (8th Cir. 2015) (holding that an argument that an earlier decision was "decided by a panel that lacked a quorum" was not relevant to a particular later decision made by a panel that "was properly constituted").

## B. The Third Motion for Reconsideration

In the Third Motion for Reconsideration, New Vista argued that the December 30, 2011 order was invalid because Member Becker's recess appointment expired on December 17, 2011 with the recess of the Senate. *See* JA0058.

Following *Noel Canning*, other courts have held that Becker's appointment was valid. We agree. A valid

29

recess appointment lasts until the close of the next Senate session, which, in Becker's case was January 3, 2012. Therefore, Becker was a duly appointed member of the quorum that decided the December 30, 2011 order.

As noted above, *Noel Canning* held that, because Griffin and Block were appointed during recesses of fewer than ten days, when including pro forma sessions, their appointments were invalid. *See Noel Canning*, 134 S. Ct. at 2574. Although the Supreme Court did not rule directly on the validity of Becker's appointment, it noted that the circumstances surrounding his appointment were different from those that made the appointments of Griffin and Block invalid: "The President appointed Member Becker during an intra-session recess that was not punctuated by *pro forma* sessions, and the vacancy Becker filled had come into existence prior to the recess." *Id.* at 2558.

We agree with our sister courts of appeals that have decided this question: Because Becker's appointment was made in a recess of more than 17 days, Member Becker's appointment was valid. *See Mathew Enter., Inc. v. NLRB*, 771 F.3d 812, 814 (D.C. Cir. 2014) (holding that Member Becker's appointment "was constitutionally valid"); *Gestamp S.C., L.L.C. v. NLRB*, 769 F.3d 254, 257–58 (4th Cir. 2014) (similar); *Teamsters Local Union No. 455 v. NLRB*, 765 F.3d 1198, 1201 (10th Cir. 2014) (similar).

Based on *Noel Canning*, there can be no question that Becker's appointment lasted through the December 30, 2011 order. A recess appointment does not expire until the end of the next Senate session. *See* U.S. Const. art. II, § 2, cl. 3 ("The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which ***shall expire at the End of their next Session***." (emphasis added)); *Noel Canning*, 134 S. Ct. at 2565 (contemplating that recess appointments would terminate at the end of the next Senate session).

Because the Senate did not declare an intersession recess, Member Becker's recess appointment expired on January 3, 2012, when the new congressional session began. *See Dodge of Naperville, Inc. v. NLRB*, 796 F.3d 31, 41 (D.C. Cir. 2015) (explaining that Member Becker's tenure ran through noon on January 3, 2012); *cf. Noel Canning*, 134 S. Ct. at 2558 ("[T]he second session of the 112th Congress began on January 3, 2012 . . . ."); *NLRB v. Bluefield Hosp. Co., LLC*, 821 F.3d 534, 538 (4th Cir. 2016) ("As of January 3, 2012, the terms of three of the Board's five members had expired.").

Because Member Becker was acting as a validly appointed Member of the Board when he joined the December 30, 2011 order, the Board correctly denied the Third Motion for Reconsideration.

31

## C. The Second Motion for Reconsideration

In the Second Motion for Reconsideration, New Vista stated that the Board's December 30, 2011 order was invalid because the third member of the panel, Chairman Pearce, was recused and therefore could not delegate his power to the remaining two members of the Board. *See* JA055. The Board has stated that Pearce recused after delegating his power. We conclude the delegation was permissible.

On December 30, 2011, when the order was issued, the Board consisted of three members: Pearce, Becker, and Hayes. Pearce determined he had a conflict and therefore could not participate substantively. As noted above, the Board's organic statute, as interpreted by *New Process Steel*, allows the Board to delegate its powers to a three-member panel and for two members to constitute a quorum of a three-member panel. *See* 29 U.S.C. § 153(b); *New Process Steel*, 50 U.S. at 681 ("[T]he group quorum provision . . . still operates to authorize a three-member delegee group to issue a decision with only two members participating, so long as the delegee group was properly constituted."). Thus, Becker and Hayes could properly enter the December 30, 2011 order if and only if the Board (Pearce, Becker, Hayes) delegated its power to a three-member panel (Pearce, Becker, Hayes) from which Pearce then recused. *See D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 353 (5th

32

Cir. 2013) ("[T]wo members of that panel may decide a case 'if, for example, the third member had to recuse himself from a particular matter.' . . . [T]he Board could validly issue its decision through two of its members, provided that the Board delegated authority to a three-member panel and that such a panel still existed when the two members acted." (quoting *New Process Steel*, 560 U.S. at 679)).

That is what the Board did here. The December 30, 2011 order explained: "Chairman Pearce, who is recused and did not participate in the underlying decision, *is a member of the present panel but did not participate in deciding the merits of this proceeding*." JA0012 n.2 (emphasis added).

New Vista challenges the Board's delegation to a three-member panel of Pearce, Becker, and Hayes on the ground that Pearce had already recused himself from the matter and therefore could not have participated in the delegation of the Board's power to a three-member panel and could not be considered a member of the three-member panel. *See* New Vista Rehearing Br. 52 ("Since Chairman Pearce previously recused himself from consideration of the case, he could not participate in the decision to delegate to a panel . . . and could not be a

33

member of the panel delegated to determine New Vista's reconsideration request." (citation omitted)).[7]

We see no reason to look behind the Board's statement that Chairman Pearce participated in the delegation and then recused from substantive deliberations. Other courts have approved this procedure. *Cf. D.R. Horton*, 737 F.3d at 354 ("There is

_____

[7] Ordinarily, there is no procedural unfairness when a conflicted decisionmaker delegates his or her authority to a neutral decisionmaker—indeed, that is what a recusal essentially entails. *Cf. In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1143 (D.C. Cir. 2005) ("As the investigation proceeded, in December of 2003, the Attorney General recused himself from participation and delegated his full authority in the investigation to the Deputy Attorney General as Acting Attorney General."); *Muffley ex rel. NLRB v. Spartan Mining Co.*, 570 F.3d 534, 539 (4th Cir. 2009) ("The General Counsel, in turn, recused himself (because of personal ties to the case) and delegated [the Board's statutory] power in the case at hand to the Deputy General Counsel."); U.S. Office of Government Ethics, OGE Informal Advisory Memorandum 99 X 8, 1999 WL 33308429, at *4 (Apr. 26, 1999) ("Recusal will mean that someone else must act in the employee's stead concerning any matters that could affect the disqualifying interest.").

no indication that the Board deviated from its customary practice of delegating authority to the three-member panel and allowing two members to decide the case when Member Hayes recused."); *Brown v. Trueblue, Inc.*, No. 1:10-CV-0514, 2012 WL 1268644, at \*6 n.7 (M.D. Pa. Apr. 6, 2012) (agreeing that the procedure in *D.R. Horton* was valid in light of *New Process Steel*).

With Pearce's involvement, three members of the Board participated in the delegation of the order denying the First Motion for Reconsideration. As we next discuss, the Board correctly denied the First Motion for Reconsideration.

## III. THE FIRST MOTION FOR RECONSIDERATION (THE DECEMBER 30, 2011 ORDER)

New Vista's First Motion for Reconsideration raised two issues with the August 26, 2011 order. First, New Vista argued that the August 26, 2011 order was ultra vires because the term of one of the three Members signing the order—Chairman Liebman—expired before the order was mailed and posted on the Board's website. *See, e.g.*, JA0052; New Vista Rehearing Br. 32, 40–48. As we stated in our previous *New Vista* opinion, Chairman Liebman was a member of the panel when the order was decided, and later ministerial acts are irrelevant to the question of the order's validity. *See New Vista*, 719 F.3d at 213–15. Second, New Vista argued that the

35

Board failed to distinguish *Frito-Lay*, a past NLRB decision that required a hearing when there were changed circumstances. As the Board has noted in subsequent cases, *Frito-Lay* applies only when the changed circumstances result from a process begun prior to the representation proceeding before the Board. Here, the Board did not apply *Frito-Lay* because it believed the changed circumstances were in response to the Board proceedings. *Cf. NLRB v. Sw. Reg'l Council of Carpenters*, 826 F.3d 460, 464 (D.C. Cir. 2016) ("[T]he Board need not address 'every conceivably relevant line of precedent in [its] archives,' but it must discuss 'precedent directly on point.'" (quoting *Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (3d Cir. 2013))).

First, with regard to New Vista's objection concerning Chairman Liebman, we previously answered this objection in our 2013 opinion. *See New Vista*, 719 F.3d at 213–15. Although we vacated our opinion with our August 11, 2014 Order granting rehearing in this case, we reaffirm our earlier reasoning on this issue. We stated then that the Board's August 26, 2011 order "is entitled to a presumption of regularity." *New Vista*, 719 F.3d at 214 (internal quotation mark omitted) (quoting *Frisby v. U.S. Dep't of Hous. & Urban Dev.*, 755 F.2d 1052, 1055 (3d Cir. 1985)). The order was dated August 26 and states that Chairman Liebman approved the decision contained therein. *See id.* The Board's failure

36

to post the order on its website prior to the August 27, 2011 expiration of Chairman Liebman's term does not rebut the presumption of regularity. *See id.* at 214–15.[8]

---

[8] In our now-vacated ruling, we cited *Braniff Airways, Inc. v. Civil Aeronautics Board*, 379 F.2d 453 (D.C. Cir. 1967), for the proposition that ministerial acts that occur after a decisionmaker has left power do not deprive the original decision of effect. *See New Vista*, 719 F.3d at 214. New Vista argues our earlier reasoning is wrong because *Braniff Airways* states that an order is treated as complete "once all members have voted for an award and caused it to be issued." *Braniff Airways*, 379 F.2d at 459. New Vista then argues that *Braniff* supports its position because there is neither "substantial evidence" of when Liebman "'voted for' or 'signed' it and of whether and when she 'caused it to be issued.'" New Vista Rehearing Br. 43. As we explained in our original decision, "the presumption of regularity requires that we consider the date as the record of when the delegee group caused the opinion to be issued, which presupposes that they voted on or before that date." *New Vista*, 719 F.3d at 215.

Moreover, any distinction between "voting for" the decision and "causing it to be issued" is irrelevant. For example, if one orders flowers on February 11 and the flowers are delivered on Valentine's Day, that person has "caused" the flowers to be delivered on February 11,

With regard to *Frito-Lay*, 177 N.L.R.B. 820 (1969), New Vista first argues that the Board "fail[ed] to hold a hearing on . . . changed factual circumstances" as required by that decision. New Vista Rehearing Br. 17–18, 49–51. Later in its brief, however, New Vista concedes that its real objection is that the Board failed to "distinguish" *Frito-Lay*. New Vista Rehearing Br. 50; *see also id.* ("This Court requires the NLRB, in order to dispel any appearance of arbitrariness, to set forth the reasons for not following its prior decisions and the distinctions that compel a different result in order to be enforced."); New Vista Rehearing Reply 22 ("[T]he

---

even though there are intermediate steps (credit card processing, packaging, delivery, etc.) between the order and the February 14 delivery.

New Vista flatly misreads the record when it argues that "the NLRB concedes [A0013] that the Decision and Order were not 'ready for issuance' until after August 26, 2011." New Vista Rehearing Br. 45. In fact, the cited page states: "There is no dispute that the Board dated the above-referenced Decision and Order ***August 26, 2011***. Consistent with Board practice, the date of the Decision and Order reflects the date on which all members had voted on the final draft. ***At that point,*** the Decision and Order was ready for issuance to the public and service on the parties." JA0013 (emphasis added).

38

NLRB has yet to explain why Frito Lay got a hearing and New Vista did not . . . .").

But the Board's August 26, 2011 order makes abundantly clear why this is not a situation where *Frito-Lay* applies. In *Frito-Lay*, the relevant changes to the duties of the employees were implemented based on the results of a consulting firm's study of the employer's organization that "beg[a]n . . . before this proceeding was instituted." *Frito-Lay, Inc.*, 177 N.L.R.B. 820, 821 (1969). The Board found that the *Frito-Lay* changes "[were] clearly not for the purpose of avoiding compliance with the Board's unit finding." *Id.*

By contrast with *Frito-Lay*, in the August 26, 2011 order, the Board took notice of the Board's own allegations that changes to the LPNs' duties were made unlawfully to "prevent them from obtaining union representation." *New Vista*, 357 N.L.R.B. at 715 n.3.[9] In

_____

[9] In response to those allegations, the Board (Hayes, Griffin, Block) ultimately "found that the employer . . . altered the duties of licensed practical nurses to convert them into statutory supervisors in order to prevent them from obtaining union representation." *See New Vista Nursing & Rehab., LLC*, 358 N.L.R.B. 473 (2012). But this finding has likely been nullified by *Noel Canning*, as acknowledged by the Board, *see Colonial Parking*, 363

so doing, the Board cited one of several cases that distinguishes *Frito-Lay* on these grounds. *See id.* at 715 n.5 (citing *Telemundo de P.R., Inc. v. NLRB*, 113 F.3d 270, 279 (1st Cir. 1997)). Indeed, New Vista's brief acknowledges several cases explaining that a business has to show that the alleged changed circumstances preexisted the representation proceeding, which New Vista failed to do here. *See Comar, Inc*, 349 N.L.R.B. 342, 359 n.36 (Feb. 2, 2007) ("*Frito-Lay* is also inapplicable because the invalidation of the unit there was based on a major overhaul of the employer's national management structure, which the Board found completely eliminated the level of organizational control upon which the unit was premised and was 'clearly not for the purpose of avoiding compliance with the Board's unit finding.'"); *K Mart Corp.*, 323 N.L.R.B. 583 (1996); *see also Telemundo de P.R.*, 113 F.3d at 278 ("An employer who seeks to overcome that presumption bears a heavy burden of showing that a legitimate business necessity arising out of circumstances that were in play before the representation proceeding concluded forced him to recast job descriptions."). Because the Board found that the facts here were distinguishable from those

---

N.L.R.B. No. 90, at 1 n.1 (2016), and, in any event, is now pending before this Court, *see* No. 12-3524. Accordingly, we do not rely on this finding.

40

in *Frito-Lay*, there was no need for the Board to invoke *Frito-Lay* simply to distinguish it.

## IV. WHETHER THE LPNs ARE SUPERVISORS (THE AUGUST 26, 2011 ORDER)

Having considered all five of New Vista's motions for reconsideration, we finally arrive at the merits: whether the LPNs have the effective authority to recommend discipline. In its August 26, 2011 order, the Board applied a test that is incompatible with our caselaw. Specifically, the Board relied on the evidence that management independently investigated the LPNs' written complaints and that few LPNs apparently submitted written complaints. Our caselaw holds that those are inappropriate factors on which to rely. We will therefore remand for further consideration.

Before discussing how the Board got it wrong, we first set out important legal factors the Board must follow on remand. *See MCPc*, 813 F.3d at 487 (3d Cir. 2016) ("Because the ALJ and Board's rejection of these rationales may have stemmed from confusion as to the appropriate analytical framework, we address the choice of test before turning to its application in this case.").

Whether LPNs in a given nursing home are statutory supervisors is a factbound question about which

41

different circuits have suggested different rules.[10] *See NLRB v. Attleboro Assocs., Ltd.*, 176 F.3d 154, 163 (3d Cir. 1999) ("[R]esolution of the question of whether a charge nurse exercises independent judgment is inherently factual in nature, although the cases suggest that similar organizational structures exist throughout the nursing home industry."); *see, e.g., Frenchtown Acquisition Co. v. NLRB*, 683 F.3d 298, 308 (6th Cir. 2012) (no supervisory status for nurses who, in a progressive disciplinary system, had authority only to "bring [nurses'] aide errors or misconduct to a manager's attention," but not to "decide how to proceed" with that information); *Schnurmacher Nursing Home v. NLRB*, 214 F.3d 260, 265–66 (2d Cir. 2000) ("In actual practice, the CNs appear not to have formally disciplined CNAs or even to have recommended discipline, albeit, the CNs

---

[10] As noted above, there is a three-part test to determine whether an employee is a statutory supervisor: (1) the employee "hold[s] the authority to engage in any 1 of the 12 listed supervisory functions" in 29 U.S.C. § 152(11), (2) the employee's "exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment," and (3) the employee's authority is held "in the interest of the employer." *Ky. River*, 532 U.S. at 713. Here, the issue is whether the nurses held the authority to effectively recommend discipline and whether they used independent judgment.

42

did, from time to time, refer CNA misconduct to a nurse manager but without recommendation.").

Our last word on the subject was in *Attleboro Associates*. In *Attleboro*, we contrasted existing precedent from other circuits and found the *Attleboro* nurses were supervisors because they had the authority, when confronted with misbehavior, to make a decision to do nothing, "counsel an offending CNA directly, or initiate a progressive disciplinary process that becomes part of a CNA's permanent personnel file and could lead to her termination." *Attleboro*, 176 F.3d at 165.

*Attleboro* rejected the Board's position that an employee does not have authority to effectively recommend discipline if the employee's supervisors independently investigate the employee's recommendation. Similar to this case, in *Attleboro*, the Board argued: "[T]o be supervisory, the actions taken 'must not only initiate, or be considered in determining future disciplinary action, but also . . . must be the basis for later personnel action without independent investigation or review by superiors.'" Br. for the NLRB, *Attleboro*, 176 F.3d 154 (Nos. 98-6168, 98-6211) (3d Cir. Dec. 7, 1998), 1998 WL 34176828, at *35 (quoting *Passavant Health Care Ctr.*, 284 N.L.R.B. 887, 889 (1987)).

Relying heavily on *Glenmark Associates, Inc. v. NLRB*, 147 F.3d 333 (4th Cir. 1998), we rejected the

43

Board's position and held that the LPNs had the power to effectively supervise the CNAs. *See Attleboro*, 176 F.3d at 164–66. We noted approvingly that *Glenmark* "recognized that the NLRA does not preclude a charge nurse from having supervisory status merely because her recommendation is subject to a superior's investigation." *Attleboro*, 176 F.3d at 164. Thus, we concluded that "an acceptance of the Board's reading of the NLRA in this case 'would . . . render the statutory phrase "effectively to recommend" nugatory.'" *Attleboro*, 176 F.3d at 165–66 (quoting *Caremore, Inc. v. NLRB*, 129 F.3d 365, 370 (6th Cir. 1997)).

In addition to relying on *Glenmark*, *Attleboro* distinguished (1) an Eighth Circuit decision and (2) a District of Columbia Circuit decision that both held that nurses were not statutory supervisors. First, in the Eighth Circuit case, the key fact was that the "nurses' disciplinary authority consisted 'solely of the power to verbally reprimand [nursing assistants].'" *Attleboro*, 176 F.3d at 165 (quoting *Beverly Enters. v. NLRB*, 148 F.3d 1042, 1046 (8th Cir. 1998)).[11]

---

[11] Our *Attleboro* precedent noted that the nurses in the Eighth Circuit case were held not to be "'an integral part of the disciplinary process' and 'play[ed] no role in determining whether an employee is disciplined or in

44

Second, in the D.C. Circuit case, "the record did not reveal *any instances* where a charge nurse exercised th[e] authority" to discipline. *Attleboro*, 176 F.3d at 165 (emphasis added) (discussing *Beverly Enters.-Mass., Inc. v. NLRB*, 165 F.3d 960 (D.C. Cir. 1999)). Thus, the D.C. Circuit held that the nurses' authority was merely "a speculative possibility, which absent demonstration, is simply 'paper power.'" *Beverly Enters.-Mass.*, 165 F.3d at 964. This was in contrast to *Attleboro* where the nurses "initiate[d] a progressive disciplinary process, and their decisions to write up a CNA bec[a]me a permanent part of the CNA's personnel file." *Attleboro*, 176 F.3d at 165.

Thus, we held that "because Attleboro's LPN charge nurses make a decision to counsel an offending CNA directly, or initiate a progressive disciplinary process that becomes part of a CNA's permanent personnel file and could lead to her termination, the charge nurses effectively recommend discipline using independent judgment within the meaning of section 2(11)." *Id.* Although *Attleboro* repeatedly points out that the progressive disciplinary process employed in that

determining the type of discipline to be imposed.'" *Attleboro*, 176 F.3d at 165 (quoting *Beverly Enters.*, 148 F.3d at 1046). Here, the Board arguably made those same findings.

45

case could ultimately lead to termination, it is clear that a nurse can be a statutory supervisor if he or she has the authority to effectively recommend less onerous discipline. For instance in *Warner Co. v. NLRB*, we held that "sending a[n employee] home is discipline"—as was "cal[ing] the plant manager's attention to instances of . . . violations of the work rules." 365 F.2d 435, 439 (3d Cir. 1966). This is also implicit in the statutory text because 29 U.S.C. § 152(11) states, among other things, that a supervisor can "hire, transfer, suspend, lay off, . . . discharge, . . . or discipline other employees." Were "discipline" the same as "lay[ing] off" or "discharg[ing]," the word "discipline" would have been mere surplusage. *See Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 182 (3d Cir. 2016) (en banc) ("We assume . . . that every word in a statute has meaning and avoid interpreting one part of a statute in a manner that renders another part superfluous." (quoting *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008))).

Following and citing *Attleboro*, we further held in another case that the "number of instances" of supervision does not determine whether employees are supervisors. *See NLRB v. Prime Energy Ltd. P'ship*, 224 F.3d 206, 210 (3d Cir. 2000) ("The mere fact that the regional director found only one instance where a Shift Supervisor sent a Plant Operator home is hardly a reasonable basis to conclude that the authority was

46

lacking. It simply suggests that the authority was rarely needed.").

Thus, applying *Attleboro*, we recognize three facts that together may show an employee is a statutory supervisor: (1) the employee has the discretion to take different actions, including verbally counseling the misbehaving employee or taking more formal action, *see Attleboro*, 176 F.3d at 165 ("Attleboro's LPN charge nurses make a decision to counsel an offending CNA directly, or initiate a progressive disciplinary process . . . ."); (2) the employee's actions "initiate" the disciplinary process, *see id.* ("The circumstances clearly are different here inasmuch as Attleboro's charge nurses initiate a progressive disciplinary process . . . ."); and (3) the employee's action functions like discipline because it increases severity of the consequences of a future rule violation, *see id.* ("[T]heir decisions to write up a CNA become a permanent part of the CNA's personnel file and could lead to the CNA's termination.").

And, from *Attleboro* and *Prime Energy*, we also derive two facts that do not disprove supervisory status: (1) whether a nurse's supervisor undertakes an independent investigation, *see Attleboro*, 365 F.3d at 164 ("[T]he 'relevant consideration is effective recommendation or control rather than final authority.' . . . [T]he NLRA does not preclude a charge

47

nurse from having supervisory status merely because her recommendation is subject to a superior's investigation." (citations omitted) (describing *Glenmark*)); and (2) whether the employees exercise their supervisory authority only a few times (or even just one time), *see Prime Energy Ltd. P'ship*, 224 F.3d at 210.

In the case before us, the Board relied on a four-part test that conflicts with the above principles. The Board derived its test from an NLRB opinion (later vacated) to determine whether the nurses here were statutory supervisors: "To prevail, the Employer must prove that: (a) LPNs submit actual recommendations, and not merely anecdotal reports, (b) their recommendations are followed on a regular basis, (c) the triggering disciplinary incidents are not independently investigated by superiors, and (d) the recommendations result from the LPNs' own independent judgment." JA873 (citing *ITT Lighting Fixtures*, 265 N.L.R.B. 1480, 1481 (1982), *vacated on other grounds sub nom. ITT Lighting Fixtures, Div. of ITT Corp. v. NLRB*, 712 F.2d 40 (2d Cir. 1983)).[12]

---

[12] In its brief in this case, the Board argues a rationale more consistent with *Attleboro* and other circuits' caselaw. But the Board should have considered *Attleboro* and other cases when it made its original

48

ruling—not after filing a petition for enforcement. *See Borovsky v. Holder*, 612 F.3d 917, 921 ("The *Chenery* doctrine prevents a court from affirming an agency's inadequately justified decision 'by substituting what it considers to be a more adequate or proper basis' for the decision." (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947))); *NLRB v. P\*I\*E Nationwide, Inc.*, 923 F.2d 506, 518 (7th Cir. 1991) ("The Board's appellate counsel cannot fill in the holes in the agency's decision; stated in another manner, it is the Board's order, not its petition for enforcement, that is the subject of our review. Accordingly, we may not accept appellate counsel's *post hoc* rationalizations for agency action." (citations and internal quotation marks omitted)); Henry J. Friendly, Chenery *Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199, 222 ("Where the agency has rested [a] decision on an unsustainable reason, the court should generally reverse and remand even though it discerns a possibility, even a strong one, that by another course of reasoning the agency might come to the same result.").

For the same reason, the Dissent's reliance on *Mars Home for Youth v. NLRB*, 666 F.3d 850 (3d Cir. 2011), is unavailing. The dissent's focus on the same conclusion being reached by our court in *Mars Home* and by the NLRB in this case is irrelevant to the question as to whether the NLRB offered correct reasoning. The NLRB

49

Under controlling law, remand is appropriate where, as here, the Board used the wrong legal standard and remand would not be futile. *See, e.g.*, *MCPc*, 813 F.3d at 482 ("[W]e will remand for further proceedings because the Board failed to apply the correct legal test . . . ."); *id.* at 490 ("[W]hether or not we agreed that substantial evidence in the record supported the Board's

---

did not. The NLRB did not rely on *Mars Home* or any post-*Attleboro* case in its explanation for what effectively recommending discipline meant. Instead, it relied on pre-*Attleboro* reasoning that we held was unreasonable in *Attleboro*. Just as the NLRB cannot rely on post hoc reasoning, the Dissent cannot now use *Mars Home* to fill in the hole in the NLRB's decision. *See ICC v. Bhd. of Locomotive Eng'rs*, 472 U.S. 270, 283 (1987) ("[A] court . . . may not affirm on a basis containing any element of discretion—including discretion to . . . interpret statutory ambiguities—that is not the basis the agency used, since that would remove the discretionary judgment from the agency to the court."). We agree that it may be inefficient to make the NLRB interpret the statute anew even though it may ultimately reach the same result, but that is a function of *Chenery*, which we must apply. *Cf.* Margaret B. Kwoka, *Deference,* Chenery*, and FOIA*, 73 Md. L. Rev. 1060, 1109–10 (2014) ("[C]ritics argue that the *Chenery* principle leads to inefficient proceedings . . . .").

50

ultimate disposition, our disagreement with [the] Board's rationale would prevent us from affirming."); *NLRB v. Alan Motor Lines Inc.*, 937 F.2d 887, 892 (3d Cir. 1991) ("If we sustained the Board's decision based on a rationale that the Board might have adopted but did not adopt, we would 'deprecate the administrative process for [we] would propel the court into the domain which Congress has set aside exclusively for the administrative agency.'" (quoting *NLRB v. Met. Life Ins. Co.*, 380 U.S. 438, 444 (1965))). By relying on a vacated NLRB precedent requiring the nurses' recommendations be implemented without any independent investigation and relying heavily on the fact that the LPNs did not frequently exercise their alleged supervisory power, the Board applied the wrong legal standard.

Nor would a remand be futile. Neither side has shown it is entitled to victory on the present record. On the one hand, the Board's findings are almost entirely inapt because they are directed to the wrong test. On the other hand, New Vista's entitlement to victory is unclear.

The Board has failed to show it is entitled to enforcement because Director Lightner's findings addressed to the wrong test are largely inapplicable to the correct test. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("The Commission's action cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order as

51

an appropriate safeguard for the interests protected by the Act. There must be such a responsible finding."); *cf. NLRB v. Local 483, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers*, 672 F.2d 1159, 1165 (3d Cir. 1982) ("If such findings are supported by substantial evidence on the record as a whole, the Board's remedial order would be enforceable by this court. Such findings have not been made by the Board here.").

For instance, Director Lightner's findings go to whether the LPNs' written notices were independently investigated, whether LPNs ultimately decided the level of discipline, or whether LPNs frequently exercised authority to effectively recommend discipline.[13] As

---

[13] Among those findings are:
- "[D]iscipline issued to a CNA is investigated by unit managers or upper management." JA0861.
- "The LPN becomes involved only as a fact witness to the underlying incident. . . . LPNs are simply reporting factual findings to their superiors without any specific recommendation for disciplinary action." JA0861, 0873.
- "LPNs rarely if ever checkmark the penalty level of discipline because they do not have access to employees' personnel files and do not know where the employee stands in the progressive disciplinary scheme." JA0861.

52

such, they are irrelevant. Indeed, some findings suggest that the nurses may be supervisors under *Attleboro*. *See, e.g.*, JA0856 ("If a nurse believes that a CNA has violated the Employer's work rules, ***the nurse has the discretion*** to (1) do nothing; (2) verbally counsel the employee without issuing any write-up; or (3) report misconduct to either the nursing supervisor or unit manager." (emphasis added)). Because the factual findings do not support the necessary legal analysis, we lack the basis to enforce the Board's decision.

---

- LPNs are not told "the outcome of a disciplinary matter" and do not attend meetings where the "discipline is served." JA0861–62.

- "The DON or other upper management officials make all final disciplinary decisions." JA0862.

- "The record shows LPN involvement in actual progressive discipline of CNAs 33 times over a 6 ½ year period. . . . Even assuming *arguendo* that the actions of the LPNs cited by the Employer constituted discipline or the effective recommendation of discipline, the record still yields a minor number of instances over a six-year period in which these actions were exercised. . . . I am reluctant to extinguish Section 7 rights here on such a slender record of disciplines over a six year stretch." JA0871, 0876.

On the other hand, the record does not permit us to conclude that New Vista has proven the nurses are statutory supervisors. *See Ky. River*, 532 U.S. at 712 ("In the unfair labor practice proceeding, therefore, the burden remains on the employer to establish the excepted status of these nurses."). For instance, it may well be that the notices issued by nurses do not become permanent parts of the CNAs' files and are not used to increase the severity of the discipline. Indeed, the paucity of disciplinary forms presented suggests that they are not kept in employees' files. Additionally, we are not unmindful of other circuits' "reportorial" cases holding that where nurses merely report factual information without actually recommending discipline, the employer fails to show that the nurses have the authority to recommend discipline. *See, e.g.*, *Schnurmacher Nursing Home*, 214 F.3d at 265–66 ("In actual practice, the CNs appear not to have formally disciplined CNAs or even to have recommended discipline, albeit, the CNs did, from time to time, refer CNA misconduct to a nurse manager but without recommendation."). Yet, any finding that the nurses here were merely "reportorial" must be reconciled with the demands of *Attleboro*. *See Attleboro*, 176 F.3d at 159 (noting that the Board's "regional Director concluded that the LPN charge nurses merely were serving in a 'reportorial' and not supervisory

54

capacity").[14]  While the Board's finding that the LPNs had discretion in how they handled misbehaving CNAs, a

_____

[14] The Board did not request deference to their reading of the statute under *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984), or *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005), as they did in *Palmetto Prince George Operating, LLC v. NLRB*, 841 F.3d 211, 216–17 (4th Cir. 2016) (deferring to the Board's interpretation of the NLRA under *Chevron* and *Brand X* to hold that nurses were not supervisors).  Had they done so, it would not have availed them here.

Unlike in *Palmetto Prince George*, the Board has not pointed to a new interpretation after the relevant controlling precedent.  *See Palmetto Prince George*, 841 F.3d at 215–16 (relying on a 2006 NLRB interpretation instead of its 1998 precedent); *see also Levy v. Sterling Holding Co., LLC*, 544 F.3d 493, 502 (3d Cir. 2008) ("[T]he Supreme Court left no doubt that if a court of appeals interprets an ambiguous statute one way, and the agency charged with administering that statute *subsequently* interprets it another way, even that same court of appeals may not then ignore the agency's more-recent interpretation." (emphasis added)).  Here, the Board relies on an interpretation that we already held was an unreasonable interpretation of the statute in *Attleboro*. *NLRB v. Attleboro Assocs., Ltd.*, 176 F.3d 154 (3d Cir.

55

1999) ("[W]e see no need to reduce the deference that we normally afford the Board, as we find the Board's interpretation of 'independent judgment' inconsistent with the NLRA under the traditional deferential standard of review . . . ." (citing *NLRB v. Health Care & Ret. Corp. of Am.*, 511 U.S. 571, 576 (1994)). *Chevron* or *Brand X* deference would not allow us to adopt an unreasonable interpretation. *See Brand X*, 545 U.S. at 980 ("In *Chevron*, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion.").

This case is also unlike *Mars Home for Youth*, on which the dissent heavily relies. The *Mars Home* Regional Director's opinion is in marked contrast to the one in this case. *See Mars Home for Youth*, Case No. 6-RC-12692 (Dec. 3, 2009) (regional director's decision), *available at* http://apps.nlrb.gov/link/document.aspx/09031d45802a3 b2c. In *Mars Home*, the regional director set forth detailed analysis based on a series of post-*Attleboro* cases, primarily *Berthold Nursing Care Ctr., Inc.*, 351 N.L.R.B. 27 (2007), cited as *Oak Park*. Because reliance on *Oak Park* is actually a new interpretation, the NLRB would have been entitled to *Brand X* deference in that case. We further note (a) that Petitioner Mars Home for Youth did not cite *Attleboro* and therefore the case was not before the court, and (2) *Mars Home for Youth* did

56

remand would not be futile because the Board could find, for instance, that the LPNs do not "initiate a progressive disciplinary process." *Attleboro*, 176 F.3d at 165.

We must remand.

## CONCLUSION

For the reasons stated above, we will vacate the Board's August 26, 2011 order and remand for the Board to apply the correct legal test on the merits issue.

---

not analyze the definition of "effectively to recommend" "discipline," 29 U.S.C. § 152(3), the key issue here.

GREENAWAY, JR., *concurring in part and dissenting in part*.

This case turns on the National Labor Relations Act's ("NLRA") definition of a "supervisor." To qualify as a supervisor, an employee must have the authority to exercise independent judgment in the performance of a supervisory function in the interest of the employer. *NLRB v. Health Care & Ret. Corp. of Am.*, 511 U.S. 571, 573–74 (1994). This case concerns our interpretation of independent judgment generally and specifically in the context of recommending discipline.

In *Mars Home for Youth v. NLRB*, 666 F.3d 850 (3d Cir. 2011), we approved of the general and specific interpretations of independent judgment at issue here. With only passing reference to *Mars Home*, the Majority rejects the general and specific interpretations of independent judgment before us. Instead of relying on *Mars Home*, the Majority rests its decision on *NLRB v. Attleboro Associates, Ltd.*, 176 F.3d 154 (3d Cir. 1999), and concludes, in a final footnote, that *Attleboro* prevents us from coming to the very conclusion that our brothers subsequently came to in *Mars Home*.

This argument lacks merit for two reasons. First, it misreads *Attleboro* by erroneously concluding that it rejected the general and context specific interpretations of independent judgment at issue here. Second, it applies the incorrect standard of deferential review to the administrative decision. Because the Majority's opinion misconstrues *Mars Home*, misreads *Attleboro*, and applies the wrong standard of review, I respectfully dissent.[1]

---

[1] I concur with Sections I, II, and III.

1

I.

In addressing New Vista's challenge to this NLRB decision, we must apply the familiar two-step analysis of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See, e.g.*, *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 574 (1988) ("[S]tatutory interpretation by the [National Labor Relations] Board would normally be entitled to deference unless that construction were clearly contrary to the intent of Congress." (citing *Chevron*, 467 U.S. 837 at 842–43, and n. 9)). "If Congress has directly and clearly spoken to the precise question at issue, our *Chevron* analysis is complete at Step One, and Congress's unambiguously expressed intent controls." *Helen Mining Co. v. Elliott*, 859 F.3d 226, 234 (3d Cir. 2017).

"[I]f the statute is silent or ambiguous with respect to the specific issue," we move to the second step of the inquiry and determine whether Congress expressly or implicitly delegated authority. *Chevron*, 467 U.S. at 842–43. "If Congress has explicitly left a gap for the agency to fill," "[s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44. If "the legislative delegation to an agency on a particular question is implicit rather than explicit," "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844.

We follow these steps even if we have already interpreted the statute unless our earlier decision decided the case on the first step. Indeed, in *National Cable & Telecommunications Association v. Brand X Internet Services*,

the Supreme Court held that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." 545 U.S. 967, 982 (2005).[2]

## II.

We must decide this case under *Chevron*'s most deferential standard of review. This case hinges on the NLRA's definition of a supervisor. That statutory text provides as follows:

> The term "supervisor" means any individual having authority, in the interest of the employer, to . . . discipline other employees . . . or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

---

[2] *See also Levy v. Sterling Holding Co., LLC*, 544 F.3d 493, 502 (3d Cir. 2008) ("[T]he Supreme Court left no doubt that if a court of appeals interprets an ambiguous statute one way, and the agency charged with administering that statute subsequently interprets it another way, even that same court of appeals may not then ignore the agency's more-recent interpretation.").

29 U.S.C. § 152(11). To determine whether an employee qualifies as a supervisor, we must answer three questions: "First, does the employee have authority to engage in 1 of the 12 listed activities? Second, does the exercise of that authority require the use of independent judgment? Third, does the employee hold the authority in the interest of the employer?" *Health Care & Ret. Corp. of Am.*, 511 U.S. at 573–74 (internal quotation marks omitted). Answering affirmatively to each and every question makes an employee a supervisor. This case relates to the independent judgment prong of the inquiry.

Following the steps established by the Supreme Court in *Chevron*, we must first ask, has Congress "directly and clearly spoken to the precise question at issue[?]" *Helen Mining Co.*, 859 F.3d at 234. The Supreme Court has held that Congress has not spoken clearly on the definition of independent judgment. In *NLRB v. Kentucky River Community Care, Inc.*, the Supreme Court found that "it is certainly true that the statutory term 'independent judgment' is ambiguous with respect to the *degree* of discretion required for supervisory status" and that "[i]t falls clearly within the Board's discretion to determine, within reason, what scope of discretion qualifies." 532 U.S. 706, 713 (2001) (emphasis in original).

Because "the statute is silent or ambiguous with respect to the specific issue," we move to the second step of the inquiry and determine whether Congress expressly or implicitly delegated authority. *Chevron*, 467 U.S. at 842–43. The Supreme Court has held that Congress expressly delegated the NLRA's interpretation to the NLRB. In *ABF Freight System, Inc. v. NLRB*, the Supreme Court noted that because the NLRB's interpretation of the NLRA "involves that kind of *express* delegation, the Board's views merit the greatest

4

deference." 510 U.S. 317, 324 (1994) (emphasis added). As a result, "[S]tatutory interpretation by the Board would normally be entitled to deference unless that construction were clearly contrary to the intent of Congress." *Edward J. DeBartolo Corp.*, 485 U.S. at 574 (citing *Chevron*, 467 U.S. 837 at 842–43, and n. 9). *Cf. Kentucky River Cmty. Care, Inc.*, 532 U.S. at 715 (refusing to defer to an NLRB interpretation that was "directly *contrary* to the text of the statute" (emphasis added)).

## A.

In light of this framework, we must defer to the NLRB's interpretation of independent judgment because it is not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843–44.

In this case, the Regional Director followed a four step process. First, the Regional Director provided the following definition of a statutory supervisor:

> Individuals are "statutory supervisors if: (1) they hold the authority to engage in any one of the 12 listed supervisory functions, (2) their exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment, and (3) their authority is held in the interest of the employer."

App. 863 (*Kentucky River Cmty. Care, Inc.*, 532 U.S. at 713).

Second, the Regional Director determined whether the individuals had the authority to engage in supervisory functions, such as assigning work, responsibly directing,

5

disciplining, effectively recommending discipline, and removing other employees from the floor.

Third, the Regional Director, relying on *Oakwood Healthcare, Inc.*, 348 N.L.R.B. 686 (2006), defined independent judgment: "The Board found that the relevant test for supervisory status utilizing independent judgment is that 'an individual must at minimum act, or effectively recommend action, free of the control of others and form an opinion or evaluation by discerning and comparing data.'" App. 866 (quoting *Oakwood Healthcare*, 348 N.L.R.B at 693).

Fourth, the Regional Director found, in light of *Oakwood Healthcare*, that the LPNs did not exercise independent judgment in performing supervisory functions. With regard to effectively recommending discipline, the Regional Director provided the following test: "To prevail, the Employer must prove that: (a) LPNs submit actual recommendations, and not merely anecdotal reports, (b) their recommendations are followed on a regular basis, (c) the triggering disciplinary incidents are not independently investigated by superiors, and (d) the recommendations result from the LPNs' own independent judgment." App. 873.

The Regional Director denied the employer's claims on the third prong of this test. Specifically, he concluded that the employer had not shown that LPNs used independent judgment in performing this supervisory function because the employer did not prove that the purported supervisors' managers followed their discipline recommendations without independently investigating them. App. 874 ("[T]he record is silent as to whether Roldan's superiors conducted an independent investigation of her claims . . . ."); *id.* at 874 ("No written documentary evidence regarding this [termination

6

recommendation] is part of the record.").  He further noted that some of the employer's own witnesses undermined the employer's claims and one of the LPNs' managers "testified that when she receives a discipline form from an LPN, she will ask for statements from the reporting nurse, the offending aide and any eyewitnesses." *Id*. at 873.  *See also id.* (explaining that another LPN manager independently investigated a discipline recommendation made by an LPN).

B.

In *Mars Home*, we approved of the three contested elements of the decision at bar.[3]  First, we observed that "[t]here is a three-part test for determining supervisory status" and quoted the same test as the Regional Director did in the decision under review.  *Id.* at 853–54 (quoting *Kentucky River Cmty. Care, Inc.*, 532 U.S. at 713).

Second, we, like the Regional Director in the case before us, adopted *Oakwood Healthcare*'s general interpretation of independent judgment and held, "A supervisor exercises independent judgment when he acts or recommends action 'free of the control of others and form[s] an opinion or evaluation by discerning and comparing data.'"

---

[3] The Majority observes that the Petitioner in "*Mars Home for Youth* did not cite *Attleboro* . . . ."  Maj. Op. at 57 n. 14.  This comes as little surprise.  As explained in this and the following sections, the NLRB decision reviewed by *Attleboro* lies in stark contrast to the one before us in *Mars Home* and the analogue we judge today.

*Id.* at 853–54 (quoting *Oakwood Healthcare*, 348 N.L.R.B. at 692–93).

Third, we "considered Mars Home's remaining" challenges to the Regional Director's decision and "f[ou]nd them without merit." *Id.* at 855. This final determination matters because the employer specifically objected to the Regional Director's conclusions about the employees' authority to use their independent judgment in effectively recommending discipline, Petitioner's Br. at 51–60, *Mars Home for Youth v. NLRB*, Nos. 11–1250, 11–1590, 666 F.3d 850 (3d Cir. 2011), and because the Regional Director's decision on recommending discipline closely paralleled the decision at bar.[4]

Indeed, the Regional Director in *Mars Home* provided the following test for deciding whether an employee exercised independent judgment in effectively recommending discipline:

> In summary, a putative supervisor's preparation of written counseling forms, write-ups or reports does not establish Section 2(11) authority, even if such documentation is part of a progressive disciplinary process, in the absence of evidence

---

[4] The Majority claims that "*Mars Home for Youth* did not analyze the definition of 'effectively to recommend' 'discipline,' 29 U.S.C. § 152(3) . . . ." Maj. Op. at 57 n. 14. Perplexingly, it does not explain how we could "consider[] Mars Home's remaining claims," including its challenge to the Board's decision about effectively recommending discipline, and "find [those claims] without merit," *Mars Home*, 666 F.3d at 855, without analyzing them.

that 1) the putative supervisor has the discretion to decide whether to document the infractions (independent judgement [sic]); 2) the document is an "integral part of the [e]mployer's progressive system in that they are used to document each phase of the disciplinary process and routinely result in actual discipline" (imposition of discipline); and 3) the documentation is accepted by higher management without independent investigation.

Regional Director's Decision and Direction of Election at 29–30, *Mars Home for Youth v. NLRB*, Nos. 11–1250, 11–1590, 666 F.3d 850 (3d Cir. 2011) ("*Mars Home Regional Director Decision*").

This test mirrors the test used by the Regional Director in the decision under review. *Compare Mars Home Regional Director Decision* at 29 ("1) the putative supervisor has the discretion to decide whether to document the infractions (independent judgement [sic])") *with* App. 837 ("(d) the recommendations result from the LPNs' own independent judgment."); *compare Mars Home Regional Director Decision* at 29–30 ( 2) the disciplinary reports "routinely result in actual discipline") *with* App. 837 ("(b) their recommendations are followed on a regular basis"); *compare Mars Home Regional Director Decision* at 30 ("3) the documentation is accepted by higher management without independent investigation") *with* App. 837 ("(c) the triggering disciplinary incidents are not independently investigated by superiors").

Like the Regional Director in the case at bar, the Regional Director in *Mars Home* applied this test by finding that two employees did not qualify as supervisors because their

9

supervisors independently investigated their recommendations for discipline. For one, the Regional Director concluded that "Employer has failed to sustain its burden of proof by a preponderance of the evidence that [alleged supervisor] effectively recommended the termination of [an employee] within the meaning of Section 2(11) of the Act" because "[a]fter [the alleged supervisor's] report was received by [the alleged supervisor's manager], both [the alleged supervisor's manager] and [another manager] set up a time to talk by telephone with [the employee] about the matter in order to investigate the matter further." *Mars Home Regional Director Decision* at 34. For the other alleged supervisor, the Regional Director came to the same conclusion because "the record is clear that the Employer has failed to sustain its burden of proof that the sexual harassment incident evinces Section 2(11) authority by the [alleged supervisor] to effectively recommend discipline and/or discharge" because "management officials made an independent investigation before reaching its termination decision." *Id.* at 35.

Thus, we have approved of the NLRB's current interpretation of independent judgment both in general and in the context of recommending discipline. As a result, these interpretations are not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843–44. The law requires me to defer to these NLRB interpretations and dismiss New Vista's challenge.[5]

---

[5] *Reilly v. City of Harrisburg*, 858 F.3d 173, 177 (3d Cir. 2017) ("In our Court 'the holding of a panel in a precedential opinion is binding on subsequent panels. Thus, no subsequent panel overrules the holding in a precedential opinion of a previous panel. Court en banc consideration is required to do so.'")

III.

The Majority takes a different approach. It does not rely upon *Mars Home*. Instead, the Majority holds that the Regional Director's decision is "squarely at odds with our controlling precedent—specifically *NLRB v. Attleboro Associates, Ltd.*, 176 F.3d 154 (3d Cir. 1999)," and "remand[s] this case to the Board to allow it to determine whether the LPNs have the authority to effectively recommend discipline under *Attleboro*." Maj. Op. at 5. *See also Id.* at 47–48 (explaining *Attleboro*'s interpretation of supervisor in the context of recommending discipline).

In its ultimate footnote, the Majority cites *Chevron* and attempts to shoehorn its decision into this framework by writing that "the Board relies on an interpretation that we already held was an unreasonable interpretation of the statute in *Attleboro*" and that "*Chevron* or *Brand X* deference would not allow us to adopt an unreasonable interpretation." Maj. Op. at 57 n. 14.[6] This attempt fails.

_____

(quoting *Policy of Avoiding Intra-circuit Conflict of Precedent*, Internal Operating Procedures of the Third Circuit Court of Appeals § 9.1)).

[6] In this footnote, the majority implies, in dicta, that the Board waived a deference based argument. The briefing does not support this assertion. New Vista conceded that "[t]he NLRB's legal determinations are subject to plenary review, but with due deference to the NLRB's expertise in labor matters [and] [t]he Court upholds the NLRB's interpretations of the NLRA if they are reasonable and consistent with the NLRA." Petitioner's Br. at 53–54. The NLRB agreed with New Vista's

11

## A.

The Majority misreads *Attleboro*. The Majority holds that "the Board relies on an interpretation that we already held was an unreasonable interpretation of the statute in *Attleboro*." Maj. Op. at 57 n. 14. The Majority does not distinguish between the general and context specific interpretations of independent judgment or explain which interpretation *Attleboro* held was unreasonable. To prove that *Attleboro* did not regard any of these interpretations as unreasonable, I analyze each of them in turn.

*Attleboro* did not reject the Regional Director's general interpretation of independent judgment. It refused to defer to the NLRB's "conclu[sion] that the 'discharge of duties involving professional judgment and discretion may nonetheless be "routine" within the meaning of Section 2(11)' and not the exercise of 'independent judgment.'" *Attleboro*, 176 F.3d at 170. Here, the Regional Director "found that the relevant test for supervisory status utilizing independent judgment is that 'an individual must at minimum act, or effectively recommend action, free of the control of others and form an opinion or evaluation by discerning and comparing data.'" App. 866 (citing *Oakwood Healthcare*, 348 N.L.R.B at 693). This interpretation springs from *Oakwood Healthcare*,

---

concession, noting, "Whether an individual is a statutory supervisor is a question of fact particularly suited to the Board's expertise and therefore subject to limited judicial review." Respondent's Br. at 18. Even if the parties did not raise it, this question constitutes an antecedent legal question that we must decide. *See Haybarger v. Lawrence Cty. Adult Probation & Parole*, 667 F.3d 408, 412–13 (3d Cir. 2012).

12

348 N.L.R.B. at 692–93, a decision issued seven years after *Attleboro*. As a result, Attleboro did not find that the NLRB's general interpretation of independent judgment was unreasonable.

Furthermore, *Attleboro* did not hold that the particular context specific interpretation of independent judgment at issue here was unreasonable. *Attleboro*'s decision on effectively recommending discipline consists of three parts. None of these parts support the Majority's position.

First, we noted that the Regional Director found that an LPN could not exercise independent judgment "because the Director of Nurses reviewed the recommendations and *sometimes* would investigate an incident before acting upon a recommendation . . . ." *Attleboro*, 176 F.3d at 164 (emphasis added). Then, "We h[e]ld *this application* of the term 'independent judgment' to the facts of this case erroneous as a matter of law." *Id.* (emphasis added).

This holding does not substantiate the Majority's position. Unlike in *Attleboro*, we now review a Regional Director decision that omitted "sometimes" and stated the rule in more absolute terms: "To prevail, the Employer must prove that . . . the triggering disciplinary incidents are not independently investigated by superiors . . . ." App. 873. In applying this rule, the Regional Director could not find a single example of when the employer accepted a discipline recommendation without investigating it. *Id*. at 873–74. As a result, the Regional Director found that the LPNs could not have exercised independent judgment because the employer *always*—not sometimes—investigated the recommendation before accepting it. Because the context specific interpretation of independent judgment here differs from the one rejected by

13

*Attleboro*, *Attleboro* could not have dismissed—let alone considered—the context specific interpretation of independent judgment at issue here.

Second, *Attleboro* "h[e]ld that because Attleboro's LPN charge nurses . . . initiate a progressive disciplinary process that becomes part of a CNA's permanent personnel file and could lead to her termination, the charge nurses effectively recommend discipline using independent judgment within the meaning of section 2(11)." *Attleboro*, 176 F.3d at 165.

This interpretation does not foreclose all other interpretations. "[T]he statutory term 'independent judgment' is ambiguous with respect to the *degree* of discretion required for supervisory status" and "[i]t falls clearly within the Board's discretion to determine, within reason, what scope of discretion qualifies." *Kentucky River Cmty. Care, Inc.*, 532 U.S. at 713 (emphasis in original). We have previously held that "Congress has not spoken on the 'precise question' before us" when a statutory term "is susceptible to multiple interpretations, and the statutory language does not directly address" the issue presented. *Egan v. Del. River Port Auth.*, 851 F.3d 263, 270 (3d Cir. 2017).[7] Because independent judgment is an ambiguous term and because ambiguous terms are susceptible to multiple meanings, independent judgment is susceptible to multiple meanings. As a result, our previous

---

[7] *See also Chevron*, 467 U.S. at 865 n. 11 ("The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.").

14

interpretation of "independent judgment" does not prohibit all other interpretations.

Third, in *Attleboro* we provided a detailed synopsis of *Glenmark Associates, Inc. v. NLRB*, 147 F.3d 333, 342 (4th Cir. 1998), noted that "[t]he situation at Attleboro is a hybrid of those of the nursing homes in *Glenmark*," *Attleboro*, 176 F.3d at 165, and observed that "the court recognized that the NLRA does not preclude a charge nurse from having supervisory status merely because her recommendation is subject to a superior's investigation." *Id.* at 164.

This summary of *Glenmark* does not make the interpretation at issue here unreasonable. Importantly, *Attleboro*'s summary of *Glenmark* is dicta. If language "was not necessary to our holding," it "was therefore dicta." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 261 n. 4 (3d Cir. 1998). This language was not necessary to our holding in *Attleboro*. In *Attleboro*, we rejected a decision that found that an LPN did not qualify as a supervisor because her recommendation was *sometimes* subject to the employer's investigation. 176 F.3d at 164. *Glenmark*, according to our summary, rejected a decision that found that an LPN did not qualify as a supervisor because her recommendation was *always* subject to the employer's investigation. *Id.* Holding that one investigation of a recommendation may not prevent someone from qualifying as a supervisor would not stop a future court from holding that two instances of investigating recommendations prohibited someone from being a supervisor. As a result, the *Glenmark* observation was not necessary to our holding in *Attleboro*.

Even if it were not dicta, I would be reluctant to follow it. Indeed, the Fourth Circuit has regarded *Glenmark* as no

15

longer binding. *Palmetto Prince George Operating, LLC v. NLRB*, 841 F.3d 211 (4th Cir. 2016). In that case, an employer refused to bargain collectively with LPNs on the theory that the LPNs qualified as supervisors. *Id.* at 214. In front of the NLRB's Regional Director and then before the Fourth Circuit, the employer "maintain[ed], however, that our analysis of 'independent judgment' in cases involving nurses issued prior to *Kentucky River* and *Oakwood* is in all respects 'consistent' with those cases, and so governs the case at hand." *Id.* at 216.

The Fourth Circuit acknowledged that before *Oakwood Healthcare*, the NLRB had interpreted independent judgment to exclude "ordinary professional or technical judgment in directing less-skilled employees to deliver services," and that the Fourth Circuit had rejected that interpretation as unreasonable. *Id.* The Fourth Circuit cited *Glenmark*, the inspiration for *Attleboro*, as an example of a case that rejected the NLRB's pre-*Oakwood Healthcare* interpretation and summarized it as "holding that nurses were supervisors given their authority to schedule and discipline nursing assistants without management approval . . . ." *Id.* It rejected this argument, the very argument that the Majority makes here, in three steps.

First, it observed that "[i]t is settled law that an agency construction entitled to deference supersedes a prior judicial construction of an ambiguous statute." *Id.* (citing *Brand X Internet Servs.*, 545 U.S. at 982). Second, it noted that *Oakwood Healthcare*'s interpretation of the statute deserved deference because the statute was ambiguous and the interpretation was reasonable. *Id.* Third, it concluded, based on *Kentucky River* and *Oakwood Healthcare*—not *Glenmark*—that the employer "simply has not shown that the Nurses must use any independent judgment when performing

16

these functions." *Id.* at 217. Specifically, it held that "[t]he record before us indicates that [the employer] has given its Nurses only the disciplinary power provided to every other employee (including CNAs themselves): the power to report rule violations to the Managers." *Id.* at 218. As a result, *Palmetto* eviscerated *Glenmark*'s power in this context.

B.

Even if the Majority's reading of *Attleboro* were correct, I could not join the Majority because it misapplies *Chevron* here. At its second step, *Chevron* asks us to determine whether "Congress has explicitly left a gap for the agency to fill" or if "the legislative delegation to an agency on a particular question is implicit . . . ." *Chevron*, 467 U.S. at 843–44. If Congress explicitly left a gap to fill, "[s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44. On the other hand, if Congress implicitly left a gap to fill, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844.

Here, the Majority focuses on the interpretation's reasonableness—not its arbitrariness, capriciousness, or manifestly contrariness—when it writes that "*Chevron* or *Brand X* deference would not allow us to adopt an unreasonable interpretation." Maj. Op. at 57 n. 14. Thus, it assumes that the less deferential implicit delegation standard applies. It makes this assumption without addressing the Supreme Court's conclusions that the NLRB's interpretations of the NLRA "involves that kind of *express* delegation," *ABF Freight System, Inc.*, 510 U.S. at 324 (emphasis added), and that "statutory interpretation by the Board would normally be

17

entitled to deference unless that construction were *clearly contrary* to the intent of Congress." *Edward J. DeBartolo Corp.*, 485 U.S. at 574 (1988) (emphasis added).

## IV.

A majority of New Vista's LPNs voted to avail themselves of protections created by Congress. The agency responsible for providing those rights found that the LPNs deserved them. In coming to this conclusion, the agency took an approach that we had previously sanctioned in *Mars Home*. However, the Majority casts away this agency's decision with passing reference to our previous precedential approval. Instead of following this precedent, the Majority harkens back to *Attleboro* and incorrectly claims that *Attleboro* rejected the agency's approach before us—an approach we are duty bound to approve. Because *Attleboro* did not regard the decision at bar as "manifestly contrary to the statute," *Chevron*, 467 U.S. at. 844, I cannot join the Majority's opinion. I respectfully dissent.